[No. S004561. Dec. 20, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
GERALD ARMOND GALLEGO, Defendant and Appellant.

## COUNSEL

Roderick R. Bushnell, under appointment by the Supreme Court, Thomas Marc Litton and Bushnell, Caplan & Fielding for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Morris Beatus, Aileen Bunney, Ronald S. Matthias, Dane R. Gillette and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—Defendant appeals from a judgment of guilt and sentence of death. A jury found him guilty of two counts each of first degree murder and kidnapping, and found he was armed with, and used, a firearm in the commission of those crimes. It also found true two special circumstances as to each killing: (i) multiple murder and (ii) murder in the commission of kidnapping.

### I. Facts

After venue was moved from Sacramento County to Contra Costa County, defendant elected to represent himself at the guilt trial. The following evidence was presented.

*Guilt phase*

1. *The prosecution case*

After drinking at the Sports Room bar in Sacramento until the early morning hours of November 2, 1980, defendant told his pregnant wife,

Charlene, he was "getting that feeling" and wanted her to "get [him] a girl." Charlene drove defendant in his car to a nearby shopping center where they noticed a young couple entering a car. Defendant gestured toward them, but Charlene told him, "No, that's a couple." Soon defendant noticed another couple—victims Craig Miller and his date, Mary Beth Sowers—entering their car. He ordered Charlene to stop the car, got out, and brought Miller and then Sowers to the car at gunpoint. Charlene saw Miller throw his own car keys out the window, and mentioned this to defendant. On defendant's order, Charlene got out and looked for the keys, but could not find them. The keys were found in the parking lot the next morning.

Soon thereafter Andy Beal (a friend of Miller) approached, recognized Miller and Sowers, and walked to defendant's car. Miller told Beal that he did not belong there, and swore at him, telling him to leave; Charlene slapped Beal and told him to go. Beal noted the car's license number as it left the parking lot, and immediately recounted these events to his friend Mike Wasserman, who happened on the scene as defendant's car departed.

Defendant directed Charlene to drive north toward a lake, and then ordered her to stop the car. He took Miller's wallet, and asked Sowers, "What are you doing with a bum like this?" He asked Charlene if she "wanted" Miller, and when she said, "No," defendant forced Miller to remove his shoes, ordered him out of the car, and shot him three times in the head.

Defendant entered the back seat with Sowers and told Charlene to drive to his apartment. He embraced Sowers, and told her she was going to be his "Mary Ellen tonight." As explained below, defendant's daughter's name is Mary Ellen.

At his apartment, defendant took Sowers into the bathroom and then the bedroom. Charlene heard arguing, and the sounds of a headboard hitting the wall. Thereafter defendant and Sowers emerged, and defendant told Charlene to get her coat and follow him. They put Sowers in the back of the car, tied her hands behind her back with ribbon, and drove north on a route different from the one they had taken previously that evening. Again, Charlene drove and defendant gave directions. Finally, as daylight was breaking, they stopped. Defendant took Sowers into a field and shot her three times. They drove back to defendant's apartment and on defendant's orders Charlene cleaned the car. They then drove to a park where defendant threw his gun and some of Sowers's jewelry into a river. Defendant told Charlene he loved her, that he did not want to "let her go," and that he'd never let anything happen to her. The two then went out for doughnuts.

Back in the apartment, defendant told Charlene to gather up the laundry, change the linen on the bed, and put the coat he had worn the previous night in a dumpster. They then left for the house of Mercedes Williams (Charlene's mother), and on the way discarded Miller's shoes in another dumpster.

They arrived at the Williamses' house and entered through the back door. The police had been notified by Beal of the previous night's events, and were in the living room, interviewing Charlene's parents. Defendant put the laundry bag on the back step, told Charlene to say nothing, and left. Charlene entered the house wearing a T-shirt reading, "I'm the very best," which she had taken from defendant's apartment.

Charlene told the police she had been with her boyfriend (whom she called Steven Feil) at a movie the night before. While the police were interviewing her, defendant telephoned, and told Charlene to meet him at a nearby ice cream store. Charlene continued to talk with the police.

She gave conflicting accounts of which car they had driven the previous evening, and then gave the police permission to search the car that had been driven. The interior was quite clean, and the officers found nothing. When the police left, Charlene drove to meet defendant, who had decided to return to the lake area to move Miller's body. After purchasing a blanket in which to wrap the body, they drove to the lake but could not locate the body.

The police went to defendant's apartment but returned to the Williamses' home after finding no one. While there they were notified that Miller's body had been found. Additional officers were dispatched to defendant's apartment.

Defendant and Charlene returned, saw the police outside both the Williamses' home and defendant's apartment, and decided to flee. They arranged to meet the Williamses in a bar, drove to Reno, and then traveled by bus to Salt Lake City. Defendant called Mrs. Williams and told her she could find the car in Reno and should change its tires. In Salt Lake City, Charlene dyed her hair, stole a purse to establish a new identity, and asked the Williamses to send money. Thereafter the two traveled to Denver, then Pueblo, Colorado, where they obtained false birth certificates for themselves.

On defendant's direction, Charlene prepared a list of topics to discuss with her mother by phone. The list read in part as follows: "1) Lawyers fool, save money. 2) Try to gain release in any property (in) car, you have

power of attorney. 3) Say nothing about anything to the police or the D.A. 4) Don't pay anything you don't have to. [This apparently referred to payments on Charlene's ring, which they had earlier pawned in Denver.] 5) Lawyer has not done anything that has been asked of him. 6) Please send money. 7) If need be, we will arrange for you to take care of the baby for awhile."

At some point, they spoke again by telephone to Charlene's parents, as well as an attorney; the Williamses and the attorney apparently balked about sending more money. Eventually defendant and Charlene went to Omaha, where they used the names Steve Calloway and Charlene Rae Bell.

They discussed several stories to tell the police if caught. In one, they would say Charlene met Sowers in a restaurant lounge at the shopping center, the four then went to a certain bar, and Miller and defendant left the bar before the women did. Alternatively, they would say they dropped Miller and Sowers at the parking lot and never saw them again.

Defendant and Charlene were arrested in Omaha when they attempted to retrieve money wired to them by the Williamses.

As noted, Miller's body had been discovered hours after the killing, on Sunday morning. He was fully clothed, but his shoes were missing. He had been shot three times in the head at point-blank range, and there was no sign of struggle. His wallet was found near the body, along with three .25-caliber Winchester Western shells.

Sowers's body was discovered three weeks later. It was badly decomposed, but it appeared that she had been fully clothed at death, and that her hands had been tied behind her back with ribbon. She had been shot twice in the head and once in the neck. Because of decomposition, it could not be determined if she had been sexually assaulted before she died. Two .25-caliber brass casings were found near the body.

Beal, Miller's friend, identified defendant in a police photographic lineup. The police conducted a warrant search of defendant's apartment, and found some .25-caliber ammunition, but no .25-caliber weapon. The ammunition was found in a partly full Winchester Western ammunition box.

The police discovered that defendant had worked as a bartender at a local bar, and had on two occasions fired his gun—a Baretta automatic—into the ceiling, and afterward patched the holes. A detective went to the bar and recovered five slugs located in the area where defendant had fired his gun. Experts determined that the recovered slugs and those from the victims'

bodies were fired from the same weapon, and that the cartridge casings found near the two bodies came from the same weapon. The casings matched substantially the casings of the bullets found in defendant's apartment.

Charlene's mother, Mrs. Williams, visited defendant in jail at various times before his trial. He admitted to her that he encountered Miller and Sowers in the parking lot and that he owned the gun used in the killings. He told her his defense would be "diminished capacity," because he had taken LSD, and that he would willingly plead to second degree murder and take a sentence of 15 years "in a minute." He noted that his story had to be planned carefully, not "halfway," and that it had to be "done" with "realistic thoughts in mind." He told her, "The only thing that they could prove for fact is that it was my gun that did it and that they were in my car that night for fact, that's all . . . ."

Meanwhile, Charlene approached the police through the first of her attorneys. She fabricated a story in which defendant introduced her to both victims in the parking lot and they later went to defendant's apartment. She claimed she slapped Miller's friend Beal in the face because he stepped on her foot. She said she last saw the victims after they all shared cocaine in defendant's living room, and defendant left with them both. According to her story, defendant returned the next morning with blood on his jacket and ordered her to throw it away.

Thereafter Charlene obtained new counsel, recanted the above story, and gave the police another statement. She pleaded guilty to two counts of first degree murder, with the understanding that she would be sentenced to sixteen years, eight months in prison, but that if the Board of Prison Terms did not agree to the sentence, she could go to trial on the original charges or plead guilty to some related charges and receive a sixteen-year, eight-month prison term. Under this agreement with the prosecutor, Charlene was required to testify truthfully, and enjoyed no immunity for perjury. She testified at trial as set out above.

2. *The defense case*

As noted above, defendant represented himself at the guilt phase, and testified in his own defense.

He described meeting Charlene in 1977 when she was almost 21 and he was 31, and had been married 5 times. He worked in a cardroom, where he cheated his customers. He denied ever striking Charlene, but he admitted pulling her hair once when she used a word that he felt was inappropriate.

He explained that although he sometimes wanted to hit her, he generally treated her with consideration and care.

He testified that Charlene became pregnant, and that they agreed she should have an abortion. Later, in 1978, they were married in Reno, and he obtained false identification papers and began using the name "Stephen Feil," the name of one of Charlene's relatives.

Defendant disputed the prosecution's theory that a Baretta was used in the murders. In an apparent attempt to discredit Charlene's testimony by throwing doubt on whether he used a Baretta to commit the killings, he presented evidence showing that in 1977 Charlene bought an FIE (Firearms Import-Export Company) gun at a local sporting goods store, for protection from a rapist who had been haunting the neighborhood. He trained her to use the gun for her protection when he was away, and he had the gun chromed so it would be more "ladylike" for her. He also took the gun to work when he expected trouble. This, he claimed, was the gun he used to fire the shots into the ceiling of the bar. Later, he asserted, Charlene bought him another FIE—"a kind of matching set"—but he had her return it for a Baretta. He admitted keeping the Baretta at the bar, but claimed he traded it for a .22-caliber automatic when he quit working there because he was getting out of "the bar business."

He described his frequent marital infidelities, noting that Charlene was jealous, but with good reason, because he was not a faithful husband. He stated that although he took drugs before he met Charlene, he used more drugs and alcohol afterward. He then moved to Oregon with another woman—his "mistress"—and she became pregnant. He moved back to Sacramento; Charlene, too, was pregnant. He did not know what to do, so he lived with neither of them, and rented an apartment.

Around November 1980 he "us[ed] drugs a lot." Both Charlene and his mistress wanted to move in with him. He selected Charlene, and because they were both out of work, they went out together on Saturday, November 1, to cheat at cards. As was their custom in such enterprises, he "pack[ed] a . . . small gun," so that if they were caught they could "leave peacefully." He stated that he had used no drugs that day, and was not drunk.

They entered the Sports Room bar about 7 p.m. They went outside and smoked marijuana with two others, one of whom, Ernie Wakefield, was the previous owner of the bar. Wakefield introduced defendant to the new manager, Dennis Botelho, and defendant asked Botelho for permission to cheat in return for a cut of the take. Botelho declined, saying he was trying to run a legitimate cardroom. Back inside, defendant began to play pool for

shots from a "pony glass," i.e., three and one-half ounces of liquor. He became very drunk, and does not even remember with whom he played pool. The next thing he remembered "for clear" was waking up in his apartment—still feeling drunk—as Charlene cleaned blood off his face with a wet towel. He went to the bathroom, noticed cuts on his face, and proceeded to the kitchen. Charlene was distressed, and told him what had happened the previous night.

She told him they had set out to commit a robbery but it somehow turned into a kidnapping. They were both armed—defendant with the FIE, and she with a .38-caliber revolver. She said they had taken the victims away from town to leave them for a long walk back, but that when Miller attacked defendant, he jumped up and shot Miller from behind. She said she had later killed Sowers to cover up the crime and "protect [their] future."

Defendant explained they then cleaned the car and attempted to cover the crime by discarding various items, including Sowers's jewelry. He said he believed Charlene's story, but felt he had to see for himself, so he had her drive him to the scene of the Sowers killing. When he saw Sowers's body, he was angry: "it was bad enough for one of us to be a murderer, and now we were both murderers." They drove back to his apartment and prepared to leave. Charlene went to her parents' house, and defendant called her there. She told him the police were there on a "missing persons report," but not to worry because they knew nothing. They went out driving again, this time to look for Miller's body, but it became dark and they could not find it. He spoke with Charlene's mother, told her they were leaving, and they departed for Reno to start a new life.

They called Charlene's mother for more money. She wired them money under Charlene's maiden name, and they were eventually arrested when Charlene's mother cooperated with the FBI and disclosed their location.

On cross-examination defendant said he "believed" he shot Miller with his FIE, but he denied shooting Sowers. He claimed he could not remember clearly what happened that night (he asserted that in addition to the marijuana and alcohol, he remembered taking PCP and LSD on the evening in question), but he did remember intending to rob, and he thought he remembered exiting the car and confronting Miller. This, defendant asserted, was consistent with his and Charlene's one previous robbery: in 1979, they abducted a man in parking lot, robbed him, and left him elsewhere. Defendant denied he was looking for someone to rape.

He could not explain why, if Charlene killed Sowers to cover his own killing of Miller, Sowers was killed far away from where Miller was killed.

He theorized that Charlene must have "dr[iven] around . . . trying to figure out what . . . to do."

After they were arrested, defendant and Charlene rehearsed some alibis. One centered around a story that defendant knew Miller and was engaged in a drug deal with him, and that the four met willingly in the parking lot and returned to defendant's apartment, and "we just went wherever."

On cross-examination defendant was confronted with numerous transcripts and reconstructed torn notes of jailhouse conversations and messages between him and, inter alios, Mrs. Williams, in which he appeared to be fabricating various alibis. He admitted he knew that the jailhouse visits were monitored and taped. He claimed that at various points he, Charlene, Mrs. Williams, and others had fabricated numerous, sometimes conflicting, false alibis, and that, among the various stories disclosed by the jailhouse transcripts and notes, he could not remember which ones he had originated and which ones were invented by others. He did remember that he initially planned to shoulder the blame to protect Charlene and, at the same time, construct an alibi that would relieve him from as much responsibility as possible. And, he stated, he "coordinated" the development of an alibi involving a friend of his who would testify that she saw defendant leave his apartment with the two victims and return alone only twenty minutes later—insufficient time to have driven to the sites where the bodies were located.

When he discovered Charlene had begun to "create her own alibi stories," however, he decided no longer to protect her, but to abandon all stories and tell his attorneys the truth. He admitted he had told various jailhouse visitors that, as a last resort, he would put on a diminished capacity defense, but he insisted that he in fact did suffer diminished capacity on the evening in question.

The prosecutor pressed defendant on whether his motive on November 1 and 2 was to kidnap and rape, or merely to rob. Defendant maintained that he believed the motive was robbery, and denied any intent to rape.

Defendant then called a number of witnesses. Tina Bulgar, who had been married to defendant's half-brother, said Charlene had never told her of defendant's violent sexual fantasies. On cross-examination, however, she admitted she did not know Charlene very well. They had not spoken about personal problems concerning their respective husbands, and she had not seen Charlene in the two years before the killings.

Dennis Botelho, the manager of the Sports Room bar, testified defendant was sober when he arrived on the Saturday evening in question, that

defendant smoked marijuana with the former owner, Wakefield, and that defendant was "pushy" and persistent in asking him (Botelho) for permission to cheat at cards. Botelho testified he left the bar about three hours later—at 10 p.m.—and that defendant was playing pool and was loud, but was not stumbling or having difficulty walking. A defense investigator testified that Botelho had told him defendant was "pretty intoxicated" and boisterous.

A former patron of the bar at which defendant worked testified that the gun used to shoot one of the bullets into the ceiling was silver, and not dark. A store clerk stated his records showed Charlene Williams purchased an FIE gun on March 26, 1980, and returned two days later with a dark-haired woman to arrange to purchase a Baretta instead. His records also showed Charlene Williams purchased a box of Winchester .25-caliber automatic ammunition on August 22, 1980.

A firearms expert testified that although he could not connect the cartridge casings found near both of the bodies to the bullets found in the bodies, he could determine that the casings from both scenes were fired from the same weapon. He also testified that the cartridge casings and bullets found at the two scenes could have been fired from an FIE gun.

Pamela David, defendant's cousin, testified that in 1980 Charlene showed her a chromed FIE gun. On cross-examination she admitted that defendant had only recently asked her about that occasion, that she had not mentioned the chromed FIE to investigators previously, and that her mother—who had also assertedly seen the chromed FIE—was unable to testify because she was at work at a Sacramento hospital, and was ill.

Richard Dangler, who lived at the lake near where Miller's body was found, testified he heard three gunshots about 7:20 a.m. on Sunday, November 2, 1980. Miller's body was discovered about 1,800 feet from Dangler's house.

An expert testified that Miller could not have been facing his assailant when he was shot. There was no evidence of a struggle at the scene, nor was there such evidence on Miller's body. The body showed two superficial abrasions, but no significant trauma to the hands or face.

Dr. Delbert Wilcox, a forensic psychiatrist, testified that based on defendant's use of drugs and alcohol since childhood, and on defendant's frequent amnesia from drug and alcohol use, he believed defendant was very intoxicated on the night of the killings, and possibly under the influence of marijuana, LSD and PCP. He did not believe defendant was able to premeditate and deliberate on the night in question. He admitted on

cross-examination, however, that when he first examined defendant he came to the opposite conclusion, i.e., nothing preventing defendant from premeditating and deliberating on the night in question.

Wilcox conceded that after his first interviews with defendant, he found no grounds for concluding that, at the time of the crimes, defendant lacked the capacity to premeditate, deliberate, and intend his actions. About six days later, after telling defendant of his conclusion, and after further interviews in which defendant explained that he had consumed alcohol and drugs on the night in question, Wilcox concluded otherwise. He conceded that defendant had a "strong bias in exaggerating the amount of alcohol that he consumed and the drunkenness that he actually experienced at that time." Taking that into consideration, however, and in view of the prosecutor's opening statement, which according to Wilcox corroborated defendant's story that he was very drunk on the night in question, as well as evidence that defendant was seen smoking marijuana in the bar, Wilcox concluded that he could not say beyond a reasonable doubt that defendant was able to deliberate or premeditate in a mature and meaningful way on the night of the offenses.

Wilcox also conceded that a number of facts, if true, supported the conclusion that defendant was able to think rationally on the evening in question: he held both victims at bay while Charlene drove; the drive provided ample time within which to premeditate and deliberate a killing; and Miller's shoes were removed at the scene, apparently to reduce the chance of escape. Wilcox also admitted that, given the evidence, defendant was capable of forming the intent to kill Miller, and he could not rule out the possibility that the events in question were the product of paraphilia, a disorder involving imaginary and fantasy sexual behavior.

### 3. *The prosecution's rebuttal evidence*

In response to Dr. Wilcox's testimony, the People presented Dr. Lee Coleman, who testified that psychiatrists have no special skills for determining a person's state of mind at a given point in time. Instead, he asserted, a judge or jury could make such determinations just as accurately, simply by considering evidence of the actor's behavior and speech at the time of the acts in question. He stressed the difference between psychiatry practiced for the purpose of therapy, and forensic psychiatry.

Coleman asserted that a person cannot commit an act without also having the intent to commit that act, and that a person cannot be intoxicated to such an extent that he can commit the acts necessary for a crime without also having the specific intent to commit the crime. He stated that a person

so debilitated by drugs that he could not form the requisite intent would also be unable to perform the physical acts constituting the crime. He also asserted that defendant's claim of amnesia was medically inconsistent with his ability to remember how many drinks he consumed, but nothing else, on the night in question. Finally, he stated that, even assuming a person has amnesia concerning certain events, that does not mean the person lacked the capacity to form intent at the time he participated in those events, and he found nothing in the facts supporting a conclusion that defendant lacked the ability to premeditate or deliberate. To the contrary, he stated, the facts—including Charlene's testimony about defendant's statements to Miller and Sowers during the car drive—supported the opposite conclusion.

In order to rebut, inter alia, defendant's claims of diminished capacity and lack of intent to rape or kill, the prosecutor moved to introduce evidence of defendant's involvement in two similar killings. After extensive in camera hearings the court agreed to allow the evidence, but granted defendant a three-week continuance to prepare his defense to the "other crimes" evidence. When trial reconvened, Charlene resumed the stand. The court instructed the jury that it was about to hear evidence of other crimes by defendant, but that it was to use that evidence only to help determine defendant's intent at the time of the charged crimes, and not as evidence of defendant's character. The following story unfolded:

Charlene first testified she last saw the FIE automatic in September 1978, when defendant threw it in the river after killing two young women on the previous evening. She explained that in mid-September 1978—two weeks before she married defendant, and two years before the commission of the crimes charged in the present case—she drove with defendant in their van to a shopping mall. On defendant's orders, she searched for a young woman to lure into the van in order to fulfill defendant's violent sexual fantasy. In the late afternoon defendant pointed out two girls, Kippi Vaught and Rhonda Scheffler, and ordered Charlene to get them. Charlene approached the girls, invited them to a party, and brought them back to the van.

Defendant entered the van, pulled the FIE automatic pistol from Charlene's purse, and told the girls they were being kidnapped. He taped their ankles and hands with white adhesive tape, and drove up Highway 80 to a frontage road near the Sierra foothills town of Baxter. He took the girls and a blanket from the van, and told Charlene to return to Sacramento and make sure she was seen, to clean the van, and to return about midnight with their other car.

Charlene went back to Sacramento, visited a friend, and cleaned out the van. She returned to the Baxter area early—about 10:30 p.m.—and gave a

signal by honking the horn and flashing the car lights. Defendant emerged from a clearing and said he was glad to see her because he was cold. He walked back to the clearing and returned with the two girls, put them in the backseat, and directed Charlene to drive to another area south of Sacramento, near the town of Sloughhouse. There, he ordered Charlene to stop the car and to turn up the radio. Outside the car he hit each girl with a tire iron, shot each in the head, and returned to the vehicle. He remarked that one of the bodies was "still wiggling," so he got out and fired more shots. They returned to their apartment.

The next day, after removing cash from the girls' purses, they threw the remaining items, as well as the FIE gun and the tire iron, in the river. Defendant told Charlene that he "did not touch" Vaught, who was the heavier of the two.

On extensive cross-examination that lasted well over three days, defendant attempted to impeach Charlene by questioning the accuracy of her initial statements about the various killings, suggesting she had something to gain by implicating him in the various crimes, and questioning why she had waited four years to disclose the Vaught/Scheffler killings. He revealed that Charlene's initial plea bargain proposal was refused by the prosecution, and suggested that she had fabricated the "other crimes" stories with the assistance of her own attorneys in order to obtain a more favorable plea agreement. He spent considerable time establishing that Charlene "had a pretty rough idea [about where Vaught and Scheffler were killed]," but that she did not know "the exact spot." In addition, he questioned Charlene about whether she first stated defendant used a crowbar, instead of a tire iron, to beat the two girls. This and similar questioning was apparently designed to discredit Charlene's testimony by suggesting that her memory was imperfect.

The prosecution presented rebuttal testimony from Charlene's attorneys to counter defendant's theory that Charlene's attorneys had obtained information on the Vaught/Scheffler killings and had given that information to Charlene so she could fabricate additional evidence against defendant. The prosecution then presented additional testimony to show defendant's participation in the Vaught/Scheffler killings. That testimony presented the following picture.

Vaught and Scheffler's bodies were found two days after they were killed. Both victims' hands were tied behind their backs with string, and there were remains of adhesive tape on their ankles and forearms. There were lacerations on Scheffler's scalp consistent with being struck by a blunt instrument such as a tire iron. She died from three gunshot wounds, inflicted by a gun

that was fired while in contact with her head. Vaught had likewise been shot in the head at point-blank range, and had been struck with a similar blunt instrument. The pathologist found semen in Scheffler's vagina and panties, but not in Vaught's.

Experts testified that the bullet casings discovered at the scene and the bullets found in the bodies came from the same weapon, and the markings were "consistent with" an FIE firearm. In addition, the seminal stains were "Type A" antigen of the AOB system from a "positive" secreter. Scheffler had "Type O" antigen and her husband was a "Type O positive" secreter. Defendant is a "Type A positive" secreter; accordingly, his semen type is consistent with that found on Scheffler.

Another expert testified that fibers recovered from Scheffler's clothing matched fibers from the carpet of defendant's van. Finally, a plant taxonomist testified that although remnants of Bracken Fern were found on the victims' socks, Bracken Fern does not grow in the Sloughhouse area where the victims' bodies were found. Bracken Fern is a common ground cover in the Baxter area, however. All of this evidence strongly supported the prosecution's theory that defendant transported the victims from Baxter to Sloughhouse, where he killed them.

### 4. *Defense rebuttal*

Defendant presented a third party defense to the Scheffler/Vaught killings. An employee of a drug store at the mall from which Charlene claimed she lured Scheffler and Vaught testified that Scheffler and Vaught were in the store about 3 p.m. on the day they disappeared. According to the employee, they accompanied a Mexican male who purchased four cans of motor oil. The employee later saw Scheffler and Vaught in the parking lot with the Mexican man, standing near a red Firebird automobile with Michigan bicentennial license plates; the three appeared to be friends.

An employee of another store testified that about 3:15 p.m., as he was leaving work to drive home, a maroon Firebird with a light interior and red, white and blue out-of-state license plates was in front of him. The occupants—two Black men—slowed down in an intersection and started a conversation with two White teen-age girls, whom the witness identified as Scheffler and Vaught. At that point the witness drove away.

Four other persons, some of whom knew Scheffler and Vaught, were driving past in a truck at approximately the same time. Initially, two of these persons testified. They saw a maroon or "burgundy" Firebird with Michigan bicentennial license plates and two Black men inside. They

noticed the two Black men speaking to Scheffler and Vaught, saw the car passenger open his door, and watched as the two girls prepared to enter the car. At this point one person in the truck yelled "nigger lover." The girls turned to look at the truck, then got in, and the Firebird was driven away. Later in the trial a third occupant of the truck, Jodie Anderson, testified to the above events as well. She believed these events occurred after 3:30, but certainly before 4 in the afternoon. She recalled that she had called out to the two girls by name as they got into the car, and that once inside the car, Vaught appeared fearful. It appeared to her, however, that the girls entered the car voluntarily, so Anderson did not then think to call the police.

Between 5:30 and 8 p.m. a married couple saw a red Firebird with out-of-state license plates drive slowly past their barn near the town of Galt, which is about five miles from Sloughhouse, where the bodies were found. They noticed that the driver and passenger in the front were Black males, and that two young girls were in the back of the car. Later—after 8 p.m.—another couple, John and Virginia Keyes, were driving to their home in Galt when a very slow maroon Firebird or Camaro entered the road in front of them. Mr. Keyes was forced to brake hard, and came within 10 to 20 feet of the car. He noticed that the car's interior light was on and that two Black men in the front seats were acting "funny." He eventually saw the car turn onto Meiss Road, near the Sloughhouse Restaurant. Virginia Keyes saw the same events. She recalled the car had out-of-state license plates, and also described one or possibly two White girls in the back of the car. She also stated that it appeared the light was on in the car in order to allow the front passenger to read a map. She admitted that two days after the event—after news of the discovery of the bodies had broken—she was interviewed by sheriff's investigators, at which time she told them she could not be sure, but she "may have seen" a third "person" in the backseat of the car. She did not mention seeing two persons in the backseat. One of the sheriff's investigators who interviewed Mrs. Keyes testified that she never told him she had seen even one girl in the car, and she did not tell him that the car had turned onto Meiss Road.

About 8:30 p.m., Robert Silva, while working on his father's Sloughhouse ranch, saw car headlights near the Meiss Road entrance to his father's property in the area where the bodies were eventually found. Because of the darkness he could not tell what kind of car it was. He did not bother to go to the area to investigate or ask the occupants to leave because it was not unusual to see cars on the property, and when he next looked the lights were not on, so he assumed the car had departed.

In order to rebut defendant's suggestion that Scheffler and Vaught were kidnapped and murdered by the two Black men in the Firebird, the People

presented the testimony of the assistant manager and manager of a shoe store at the shopping mall where Charlene testified she had found the girls. They recounted that Scheffler entered the store at 2:30 p.m. on September 11, asking for a cash refund for a pair of shoes. She was told she needed a receipt in order to obtain a cash refund. She returned between 4 and 5:30 p.m. with the receipt, and received the refund.

### Penalty phase evidence

Near the conclusion of the guilt phase, defendant decided that if a penalty phase were necessary, he would not represent himself, but would accept appointment of counsel. He was represented at the penalty phase by Richard G. Fathy.

### 1. The People's case

The People presented evidence that defendant had committed two additional murders, and various other crimes. Charlene, several police officers, and others provided the following testimony.

a. *Linda Aguilar.* In June 1980—five months before the Miller/Sowers killings—defendant and Charlene drove through Oregon on the coast highway. There they met Linda Aguilar, five months pregnant, hitchhiking to a nearby town. After she accepted defendant's offer of a ride defendant pulled a gun, tied her hands behind her back, placed her on a bed in the rear of the van, and drove to a meadow where he ordered Charlene to walk away. Fifteen or twenty minutes later, when he ordered Charlene to return, she noticed that Aguilar was dressing. Defendant retied Aguilar's hands and drove to a beach. Despite telling Charlene he would not "do anything" to Aguilar because she was pregnant, he took her from the van, knocked her unconscious, and strangled her. He buried her in the sand, using a hubcap to dig the grave.

The body was discovered two weeks later. She was dressed in clothing described by Charlene, and her ankles and wrists were bound by yellow nylon rope. She had been killed by a blow from a blunt object. Because of decomposition, it could not be determined if she had been strangled or sexually assaulted. After her arrest, Charlene directed police officers to the area where Aguilar had been killed and buried.

b. *Virginia Mochel.* A month later—in mid-July 1980—defendant and Charlene stopped at the Sail Inn bar after spending the day fishing in the Sacramento Delta. Defendant told Charlene he wanted to rob the bar and get "her too," referring to the bartender, Virginia Mochel. After the bar

closed they kidnapped Mochel and took her to defendant's home. On the way she pleaded with him, saying she was concerned for her children.

Defendant ordered Charlene to go inside, and he stayed in the van with Mochel. When Charlene eventually returned they all drove to where defendant and Charlene had fished earlier in the day. Defendant went to the back of the van, ordered Charlene to turn up the radio and not watch him, and strangled Mochel. They drove back home. Mochel's body was discovered three months later near a fishing area, her hands bound by fishing line. The body was severely decomposed, so it could not be determined if she had been sexually assaulted.

A detective investigating Mochel's killing contacted defendant and asked him if he had been at the Sail Inn on the night of Mochel's disappearance. Defendant admitted he had been there, but claimed he had been drunk and remembered nothing of the evening's events. When the detective later tried to contact defendant, Charlene falsely told him defendant was a truck driver and was often out of town. After her arrest, Charlene led police officers to the exact spot where Mochel's body had been found.

c. *The escape plan.* While incarcerated in jail awaiting trial, defendant conspired with another inmate, Andrew Brice, to escape. Sheriff's deputies found under Brice's mattress a torn note reading, "Could be a ticket out of here. Lay dead. There is a snitch on the tier but I don't know who. Can you get it. Put it under the heater outside your cell." In a hidden location in front of Brice's cell deputies found a jail-made shank, and in defendant's cell they found mattress covers in torn strips. A handwriting expert testified that in his opinion defendant wrote the note found in Brice's cell.

d. *Mary Ellen Gallego.* The jury learned by stipulation that defendant had committed acts of sexual intercourse, oral copulation and sodomy on his daughter, Mary Ellen Gallego, from the time she was 6 or 7 until she was 14. When Mary Ellen resisted, defendant told her the sex acts were "only natural." He also beat her, and once chipped her tooth by hitting her in the jaw. Mary Ellen reported these incidents to the police in 1978. In addition, a stipulation to defendant's prior criminal record—including an adjudication for lewd conduct when he was 13 and an adjudication for armed robbery when he was 16—was entered in evidence.

2. *Defense evidence*

An attorney from Mississippi, Frank J. Hammond, Jr., testified that he had represented defendant's father in a murder case in the mid-1950's. He

stated that defendant's life closely paralleled that of his father, and that the similarities between the two men were both eerie and shocking.

On direct examination Hammond read to the jury a lengthy letter written to him by defendant's father, who was at the time in jail awaiting trial for killing a police officer. The letter described the writer's state of mind at the time he killed the officer, and read in part as follows.

"He was afraid and he kept begging me not to kill him, but I knew I was, and that thought made me feel good inside . . . . I told him I wouldn't, but I knew I was, and I could hardly wait to kill him . . . . I knew they would find out who killed this cop, but that didn't matter to me because I was going to have a good time killing this cop. Still he begged me not to kill him, said he had a wife and children, but I never really heard him for I only had one thought in mind . . . . I made him start walking, and he knew then I meant to kill him . . . . I fired the first shot, and he fell to the ground moaning, I fired again but missed, so I walked over to him and put the barrel of the gun to his head and shot again. He laid still after that, and I turned around and got into his car, lit a smoke and drove off. In killing him I felt no guilt at all. What I did I was justified in doing . . . . When I killed this cop, it made me feel real good inside. I can't get over how good it did make me feel, for the sensation was something that made me feel elated to the point of happiness, for I had achieved in putting to death one of my tormentors. After killing him, I wanted to kill some more . . . ."

Hammond explained he had attempted to prove defendant's father was not guilty by reason of insanity, but was unsuccessful. After defendant's father was convicted of murdering a police officer, he threatened to kill the district attorney and the judge as well. While the case was on appeal, he escaped and killed another police officer. Defendant's father was eventually executed in 1955.

Defendant's mother testified by telephone. She recalled defendant suffered physical and emotional abuse as a child. She testified she married defendant's father (her third husband) at age 18, and contracted rheumatic fever and uremic poisoning during her pregnancy. Defendant's father left before defendant was born, and defendant never met or communicated with him. His mother remarried a fourth time but that stepfather beat defendant and would not allow him to show affection toward his mother.

Defendant's mother asserted his troubles could be traced to Charlene. She admitted, however, that she knew he had mistreated and sexually molested his daughter Mary Ellen before meeting Charlene, and that between the ages 13 to 17 he was incarcerated much of the time—the first occasion

for a sexual offense committed on a 7-year-old girl. She also testified defendant suffered head injuries from a car accident in 1968 or 1969.

Dr. Charles Golden, a clinical psychologist with a specialty in clinical neuropsychology, testified defendant was not insane and had normal intelligence, but the right frontal lobe of his brain was damaged, and this condition was aggravated by alcohol and drugs. Dr. Golden felt defendant's brain damage most likely stemmed from the late 1960's car accident, after which defendant was in a coma for a week, but he noted that defendant had suffered numerous prior head injuries dating back to when he was five and fell from a tree. The result of this frontal lobe brain damage, Dr. Golden stated, was that defendant did not see the world the way others did. Persons with such damage have difficulty discriminating one emotion from another; are typically manic-depressive; and, because they may feel others are conspiring against them, attempt to manipulate others.

A psychiatrist, William Reed, testified defendant suffered from a severe personality disturbance, the primary feature of which was the persistence into adulthood of infantile characteristics. He "trusted" Dr. Golden's conclusion that defendant suffered organic brain problems. After exploring defendant's family history, he also believed defendant had inherited various "antisocial personality traits" from other family members who had severe personality disturbances. He felt defendant's emotional development had been retarded: although he had wished for a strong and protective father, he was angry with his own father, whom he never met; also, defendant wished for his mother's love and attention, and he was furious with her for hurting him. He felt defendant's victims were viewed by defendant as extensions of his mother, and his feelings toward his mother were displaced to them. He felt that defendant's own son—Gerald Armond Gallego, Jr., might face similar problems if, like defendant, he was unable to at least receive letters and communications from his father. Finally, Reed agreed that defendant was not insane but that he was severely disturbed.

Hans Zeisel, a professor at the University of Chicago, testified that in his view (and the consensus view of other experts) the death penalty has not been shown to have a deterrent effect. He pointed out that the present case demonstrates the death penalty apparently had no effect on defendant, who had not been deterred from committing his crimes even though he knew his own father had been executed.

Finally, Dr. Craig Haney, a psychologist with a law degree who specialized in the psychology of imprisonment, described the physical security that would face defendant if he were sentenced to life in prison without the possibility of parole. He testified specifically about the intensive security

conditions at San Quentin, and asserted that a person sentenced to life without possibility of parole would never be able to leave the walls of the prison.

Six months after the guilt phase trial began the jury heard closing arguments, was instructed by the court, and retired to deliberate. About two and one-half hours later it returned a verdict of death.

## II. *Guilt phase issues*

### 1. *The trial court's rulings on defendant's self-representation and related motions*

Defendant makes numerous challenges relating to the trial court's rulings on his various counsel and self-representation motions. In order to analyze these claims we must set out in some detail the procedural history.

Defendant was arraigned in Sacramento County, and he thereafter moved for a change of venue. In late March 1981, before that motion was resolved, he filed the first of many motions for a *Marsden* hearing (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]), asserting that his counsel, Deputy Public Defender Donald Manning, had failed to file requested motions or secure the services of an investigator. Pursuant to *Marsden, supra*, defendant asked the court to discharge Manning and/or to appoint a different attorney. When a hearing was held, however, defendant told the court he was satisfied with Manning, and would withdraw his *Marsden* motion.

Three months later defendant filed another *Marsden* motion, seeking substitution of Manning for his failure to file, inter alia, a suppression motion. Defendant's concerns were resolved to his satisfaction after discussing the matters with the court. In September 1981, however, defendant again raised the counsel issue, claiming a conflict of interest had arisen between him and Manning because Manning had made promises that he had not fulfilled. At a hearing on these matters defendant requested new counsel. After a subsequent in camera hearing the court denied defendant's motion to relieve Manning. Defendant then wrote to the court, claiming a "complete and total breakdown in communication" between himself and Manning, filed a declaration of conflict between attorney and client, and formally requested substitution of counsel. At a later hearing, however, defendant elected not to pursue his counsel motions, in favor of waiting for a ruling on a previously filed change of venue motion. Still later—in early 1982—defendant filed another declaration of a conflict with Manning. After

a hearing the court denied defendant's request for substitute counsel, stating it had heard no new evidence establishing a true conflict.

In March 1982, on Manning's motion and pursuant to Penal Code section 1095, the court appointed Richard G. Fathy as second counsel for defendant. In June of that year defendant filed a *Faretta* motion (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]), seeking to discharge both counsel and proceed in propria persona. Defendant agreed the court could defer ruling on the *Faretta* motion until after it ruled on his pending motion for change of venue. When the court granted the change of venue, the case was transferred to Contra Costa County, where defendant immediately renewed his *Faretta* motion.

Judge Spellberg, who eventually presided over defendant's trial, conducted the *Faretta* hearing. After hearing defendant in camera, the court posed the question whether defendant should be examined by a psychiatrist pursuant to Penal Code section 1368 (all further statutory references are to this code unless otherwise stated) to determine if he was competent to stand trial. Defendant, his counsel, and the prosecutor all opposed the court's suggestion, and defendant asserted he would not participate in any such interview. After further discussion the court decided an examination would not be appropriate; it found defendant's responses to be intelligent, alert and bright, and proceeded to consider the *Faretta* motion.

The court questioned defendant thoroughly and advised him of the consequences of representing himself. The court specifically advised defendant that "if you are dissatisfied with the counsel you have presently and may wish to substitute counsel, the court would entertain that as an alternative to your representing yourself." Defendant asserted he did not want substitute counsel, he knew his case better than anyone else, and he wanted to represent himself.

The court gave defendant a day to reconsider his request, and then brought in Justice Channell, then a superior court judge, to help explain to defendant the pitfalls of proceeding in propria persona. After Justice Channell described his experiences with defendants who represented themselves in major cases, and after the trial court again advised defendant of the dangers of self-representation, defendant stated he had considered the matter carefully and still wanted to represent himself. The court advised defendant that he would not be able to stop the case in the middle of trial by announcing that he had changed his mind and wanted a lawyer. Defendant stated he understood, and the court, concluding defendant appeared competent to represent himself, granted his *Faretta* motion. The court also appointed a third attorney—Thomas Maddock—as "advisory" and "standby"

counsel for the guilt phase, and stated that it would appoint Fathy to handle the penalty phase if circumstances warranted.

During voir dire defendant refused to communicate with Maddock, and repeatedly objected to the court in chambers about Maddock's presence. After voir dire was completed defendant successfully moved to have Maddock dismissed.

After the trial began defendant complained to the court that he was having difficulty making appropriate objections. Approximately two months after jury selection commenced, and about one month into the prosecution's case-in-chief, defendant—after failing to cross-examine Charlene's mother and experiencing difficulty cross-examining Charlene—told the court in chambers, "The bottom line is I don't know if I can continue . . . . I would respectfully request . . . that my lawyers be reassigned to my case." He explained that he had not wanted to impeach his former mother-in-law, and that he had "emotional" problems cross-examining Charlene. The trial court responded, "I can't reassign a lawyer at this particular point in the case. If you wish me to get advisory counsel to come in, I will get advisory counsel. But I warned you when we started this case that I was unprepared to allow the case to be stopped in the middle. [¶] I cannot conceive of any lawyers willing to come in at this point. If Mr. Manning and/or Mr. Fathy wish to come into this case at this point and take it up at this point, I will assign them. But I know they are going to be unwilling to do so. But I will certainly contact them."

Defendant stated that if Manning or Fathy refused to return he would continue to represent himself, and that he refused to allow Maddock to assist him. The court told defendant that it could attempt to locate other attorneys willing to enter the case if Manning and Fathy declined, and defendant responded he doubted any other lawyer would be willing to do so.

The court contacted both Manning and Fathy and asked them to return to the trial after being granted a continuance. Both attorneys declined, saying that because they had not participated in jury selection or heard the prior testimony, they would not return unless the court granted a mistrial. The court explained to defendant that in light of his earlier warnings about defendant's changing his mind in the middle of trial, the court would not grant a mistrial. The trial resumed with defendant continuing to represent himself.

At various later times defendant complained in chambers that he was having difficulty cross-examining Charlene. When the prosecution proposed

to introduce, as "other crimes" evidence, testimony about the Vaught/ Scheffler killings, defendant again asked the court to appoint Manning and/or Fathy. The court again contacted Manning and Fathy, but again each refused to reenter the case unless a mistrial was granted, and again the court stated it saw no grounds for so doing. Finally, for the third time— during the prosecution's rebuttal—defendant announced, "this trial is not how I expected trial to be," and asked the court to order Manning to return to the case. The court reminded defendant that it had spoken numerous times with both Manning and Fathy, and that both refused to reenter the case unless a mistrial was granted, which the court refused to do. The court noted that it had attempted to find other attorneys willing to enter the case without a mistrial being granted, but was unable to locate any such counsel. The court allowed defendant to telephone Manning personally to attempt to convince him to return, but Manning held firm and refused to do so. As noted above, Fathy eventually agreed to return to the case to represent defendant at the penalty phase.

a. *Waiver of counsel.* ■ Defendant asserts he did not make a knowing or intelligent waiver of counsel. (*Faretta, supra*, 422 U.S. 806, 835 [45 L.Ed.2d at pp. 581-582].) The record as a whole belies his claim, and demonstrates that the court cautiously and at length informed defendant of the dangers of self-representation, and that defendant freely elected his course despite all advice to the contrary because he felt he could present his case better than anyone else. (See *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1225 [259 Cal.Rptr. 669, 774 P.2d 698].)

In his reply and supplemental briefs defendant cites numerous examples of his confusion over legal and other matters during the course of the six-month trial. It is hardly surprising that a lay person granted self-representation rights would find various aspects of trial confusing, and might present aspects of his case to his own detriment, but it is also irrelevant to the question whether the waiver of counsel was knowing and intelligent. (See *Ferrel* v. *Superior Court* (1978) 20 Cal.3d 888, 891 [144 Cal.Rptr. 610, 576 P.2d 93].) As defendant himself stated to the court during the *Faretta* hearing, "Your honor, my knowledge of the law is not one of the factors that qualifies me for *Faretta* . . . . Whether I stumble through *Witherspoon* or sail through like a Supreme Court Justice would not be a qualification."

In a related argument, defendant, citing cases in which defendants elected to proceed in propria persona in the face of trial courts' erroneous refusals to consider appointment of substitute counsel (*People* v. *Cruz* (1978) 83 Cal.App.3d 308 [147 Cal.Rptr. 740]; *People* v. *Hill* (1983) 148 Cal.App.3d 744 [196 Cal.Rptr. 382]), also suggests the court should have interpreted his *Faretta* motion as a *Marsden* (*supra*, 2 Cal.3d 118) motion for substitution

of counsel. He concludes the court erred in failing to determine whether defendant merely sought appointment of different counsel. As explained above, however, the Sacramento Superior Court addressed and resolved defendant's *Marsden* concerns. Six months later, after the matter was transferred to the Contra Costa Superior Court, Judge Spellberg expressly asked defendant whether he sought replacement counsel, and told defendant the court would be willing to entertain such a request. Defendant plainly responded he did not seek replacement counsel, and that he wanted only to represent himself because he felt he was the best advocate for his cause. We conclude, as we have in other recent cases, that the court did not err in failing to treat the *Faretta* claim as a *Marsden* motion for substitution of counsel. (See *People* v. *Crandell* (1988) 46 Cal.3d 833, 854-855 [251 Cal.Rptr. 227, 760 P.2d 423] ["A request for self-representation does not trigger a duty to conduct a *Marsden* inquiry . . . or to suggest substitution of counsel as an alternative."]; *People* v. *Burton* (1989) 48 Cal.3d 843, 855 [258 Cal.Rptr. 184, 771 P.2d 1270].)

b. *Defendant's competence to waive counsel.* ■ Defendant suggests that because the court at first considered requiring defendant to undergo a competency or psychiatric examination under section 1368, it erred in later accepting defendant's waiver of counsel. The record discloses, however, that the court was simply being cautious in suggesting the need for an examination, and it later stated that its initial concerns about defendant were incorrect. Indeed, the court concluded defendant did not appear to be any less competent than "anyone else in this courtroom." The record plainly establishes that defendant had the mental capacity to realize the probable risks and consequences of self-representation.

c. *Failure to order a competency hearing.* ■ In a related argument, defendant suggests the court abused its discretion in *failing to order* a section 1368 competency hearing. First, contrary to defendant's view, *People* v. *Hale* (1988) 44 Cal.3d 531 [244 Cal.Rptr. 114, 749 P.2d 769] and *People* v. *Marks* (1988) 45 Cal.3d 1335 [248 Cal.Rptr. 874, 756 P.2d 260] are plainly inapposite; in those cases, the trial courts ordered hearings under section 1368, but the hearings were never held. Here, as noted above, the trial court never ordered such a hearing.

The record reveals the court's preliminary concerns about defendant's competency to stand trial were resolved to its satisfaction after discussions with defendant and both counsel. Because there was no "substantial evidence" (such as a sworn statement of a mental health professional that defendant was incapable of understanding the purpose and nature of the proceedings) of defendant's incompetence to stand trial, the decision to order such a hearing was left to the court's discretion. (*People* v. *Pennington*

(1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].) On this record we do not find the court abused its discretion.

d. *Conduct of "standby counsel."* As noted above, Attorney Maddock was appointed standby counsel at the start of trial, but was relieved at the conclusion of voir dire. Defendant refused to speak or communicate with Maddock, objected to Maddock's passing a note to him, and at various points complained to the court that he did not want the jury to receive the impression that Maddock was assisting him. To this end the court granted defendant's request that Maddock be instructed to sit far away from him, and that when it became necessary to hold discussions in chambers, Maddock should not enter the judge's chambers with defendant, but rather should use a side door.

██ Despite these precautions defendant insists Maddock's presence was so intrusive he was denied his right to self-representation, citing *McKaskle* v. *Wiggens* (1984) 465 U.S. 168 [79 L.Ed.2d 122, 104 S.Ct. 944]. In that case the standby counsel was considerably more visible to the jury than was Maddock, and yet the high court *rejected* a claim of excessive interference with self-representation rights. For example, counsel in *McKaskle*, at the trial court's request, questioned one of the defendant's witnesses in order to lay a foundation for introduction of a document, and the defendant then resumed his examination of the witness. The court found "irreproachable" this and other aspects of standby counsel's involvement in the "basic mechanics" of jury trial. (*Id.*, at p. 185 [79 L.Ed.2d at pp. 137-138].) In contrast, Maddock was not even introduced to the jury, defendant never consulted with him in front of the jury, and he was instructed to sit away from defendant. We conclude *McKaskle* provides no support for defendant's claim of unreasonable interference.

e. *The court's rulings on defendant's motions to change from self-representation to counsel representation.* ██ Defendant asserts the trial court failed to exercise discretion or judgment in the face of his midtrial requests for appointment of counsel, and that reversal is required.

In *People* v. *Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187], we set out various factors a trial court should consider when faced with a midtrial request to change from counsel representation to self-representation. We expressed no opinion about the inquiry needed in the opposite situation, i.e., when a self-represented defendant seeks appointment of counsel midtrial. (See *id.* at p. 131, fn. 7.) Subsequent Court of Appeal decisions have addressed that issue. In *People* v. *Elliott* (1977) 70 Cal.App.3d 984 [139 Cal.Rptr. 205], the court held: "Some of the factors to be considered are similar to the factors involved in the exercise of discretion

by the trial court in ruling on a defendant's request to change from counsel-representation to self-representation. Relevant factors should include, among others, the following: (1) defendant's prior history in the substitution of counsel and the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney. [¶] As in *Windham*, a trial judge must establish a record based upon the relevant factors involved and then exercise his discretion and rule on defendant's request for a change from self-representation to counsel-representation." (*Elliott, supra,* 70 Cal.App.3d at pp. 993-994; see also *People v. Cruz, supra,* 83 Cal.App.3d 308, 321.)

In *People v. Smith* (1980) 109 Cal.App.3d 476, 484 [167 Cal.Rptr. 303], the court accepted the *Elliott-Cruz* factors, but added: "While the consideration of these criteria is obviously relevant and helpful to a trial court in resolving the issue, they are not absolutes, and in the final analysis it is the totality of the facts and circumstances which the trial court must consider in exercising its discretion as to whether or not to permit a defendant to again change his mind regarding representation in midtrial." We agree with *Smith*, and conclude that viewing "the totality of the facts and circumstances" the trial court here properly exercised its discretion.

As noted above, before trial defendant made numerous motions and declarations concerning his conflict with Manning and Fathy. Subsequently, however, he wanted only them to represent him. This history militates against defendant's midtrial request.

Defendant stated he changed his mind because he felt he could not adequately cross-examine Charlene and her mother. By that advanced stage of trial, however, he had exhibited considerable knowledge of both trial tactics and trial procedure. In this setting, the court could have legitimately discounted defendant's protestations, and concluded his future effectiveness would not be impaired.

The request came late in the guilt phase trial, after a substantial part of the prosecution case had been presented, and after defendant had a chance to perceive that things were not proceeding as smoothly as he had envisioned. Contrary to defendant's claim that the court blindly held to its pretrial "warning" that defendant would not be allowed to change his mind about self-representation midtrial, the record shows the trial court on three occasions attempted, at defendant's request and on his behalf, to bring

former counsel back into the trial. And, contrary to defendant's suggestion, the record does not suggest the trial court confined its search for appropriate counsel to Manning and Fathy and no one else. In fact, the record demonstrates the court attempted, unsuccessfully, to locate other counsel willing to enter the case and accept a continuance.

The court's refusal, on these facts, to accede to counsel's demand of a mistrial as the price of their return, does not render the trial court's decision an abuse of discretion. The court was apparently willing to allow a continuance, and hence a delay of the trial, but was not willing to allow a mistrial, which the court felt was unwarranted under the circumstances. Although the court might have simply ordered Manning and Fathy to return to the trial on threat of contempt (see *People* v. *McKenzie* (1983) 34 Cal.3d 616 [194 Cal.Rptr. 462, 668 P.2d 769]), we are not prepared to say in these circumstances that the court abused its discretion in failing to do so. In sum, we perceive no abuse of discretion in the trial court's rulings.

f. *Defendant's presence during discussions with previous counsel.*
■ In his supplemental brief defendant asserts the court erred by conducting in-chambers discussions by telephone with Manning and Fathy without his presence and without his express waiver of presence. He asserts, inter alia, "[t]he proceeding was exceedingly important, as it determined whether counsel would reenter the case and what their specific reasons were for not reentering the case."

"As a general rule, the accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him, and '[t]he burden is upon defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial.'" (*People* v. *Hovey* (1988) 44 Cal.3d 543, 573-574 [244 Cal.Rptr. 121, 749 P.2d 776].) In *Hovey* we held the defendant had no right to be present at an in-chambers hearing on his trial counsel's competence.

The People suggest defendant waived his presence by acceding to the court's stated plans to telephone former counsel and to solicit other counsel as well, apparently without defendant's presence. We need not decide whether defendant waived his presence, however, because it is clear that in any event defendant cannot show that the telephone discussions between the court and former counsel bore a substantial relation to his opportunity to defend against the charges. Nor can he show that his absence from such discussions would have altered his former counsel's decisions (we note that the court had offered defendant the opportunity to telephone former coun-

sel personally), much less that his absence prejudiced his case or denied him a fair trial.

### 2. *"Death qualification" and "fair cross-section" requirement*

■ Defendant asserts the court erred by denying his motion for separate guilt and penalty phase juries, and in allowing voir dire "death qualification" of the jury. We have repeatedly rejected these claims (see, e.g., *People* v. *McLain* (1988) 46 Cal.3d 97, 106 [249 Cal.Rptr. 630, 757 P.2d 569]), and for the same reason do so here.

### 3. *Wheeler error*

■ Defendant, citing *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], asserts the trial court committed prejudicial error by failing to make inquiry into his claim that the prosecutor was using his peremptory challenges to remove Blacks from the jury. As the People point out, however, the issue is waived because defendant failed to raise it at trial. (Cf. *People* v. *Carrera* (1989) 49 Cal.3d 291, 331, fn. 29 [261 Cal.Rptr. 348, 777 P.2d 121].)

At the start of a December 1982 hearing on defendant's *Buford* motion (*People* v. *Buford* (1982) 132 Cal.App.3d 288 [182 Cal.Rptr. 904]; see also *People* v. *Morales* (1989) 48 Cal.3d 527, 545-549 [257 Cal.Rptr. 64, 770 P.2d 244]), the prosecutor clarified the scope of the hearing: "Your honor, I assume that this hearing is addressing itself to the limited issue of the so-called *Buford* motion. And from the defendant's written motion he, as I understand it, is limiting his objections to the fact that he claims there was an underrepresentation of Negroes in the panels that were sent to this department and of ex-convicts. He claimed they were systematically excluded . . . ." The court asked, "Is that correct, Mr. Gallego? . . ." Defendant answered, "yes." Now defendant points to his comment some 55 transcript pages later—at the end of the *Buford* hearing—to the effect that the prosecution had disqualified all Blacks who "did hit the jury box." He asserts the court's failure to inquire into his comment requires reversal under *Wheeler*, *supra*, 22 Cal.3d 258.

Defendant failed even to raise a *Wheeler* claim, let alone establish a prima facie case of misuse of peremptory challenges. No error appears.

### 4. *Motions for a second change of venue or to sequester the jury*

a. *Change of venue.* As noted above, the Sacramento Superior Court granted defendant's change of venue motion. Both defendant's coun-

sel and the prosecutor agreed the trial should be held in neighboring Contra Costa County, approximately 50 miles from Sacramento, but defendant wanted the trial moved to Southern California. ▆▆▆ After the case was transferred to Contra Costa County, and after his successful *Faretta* motion, defendant moved for a second change of venue. He asserts the trial court erroneously denied his motion.

▆▆▆ When faced with a colorable claim that a trial court's denial of a change of venue motion may have denied the defendant a fair trial, the reviewing court must independently examine the record to determine "whether, in light of the failure to change venue, it is reasonably likely that the defendant in fact received a fair trial." (*People* v. *Williams* (1989) 48 Cal.3d 1112, 1125-1126 [259 Cal.Rptr. 473, 774 P.2d 146].) In making this assessment we are guided by the following factors and principles. First, we consider "the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim." (*Id.*, at p. 1125, and cases cited.)

Second, we have also frequently recognized that review of such matters on appeal—as opposed to pretrial review by writ—affords the reviewing court the opportunity to analyze and consider the voir dire of the jurors actually selected. " '[V]oir dire may demonstrate that pretrial publicity had no prejudicial effect,' or conversely may corroborate the allegations of potential prejudice." (*Williams, supra*, 48 Cal.3d at p. 1125, and cases cited.) ▆▆▆ We proceed to determine, based on these factors and guidelines, whether it is reasonably likely defendant did not have a fair trial. (*Williams, supra*, at p. 1126.)

The charged offenses were obviously grave, and of a nature likely to attract much press attention. There was in fact substantial coverage, both print and electronic, but the coverage occurred mostly in late 1980—two years before the trial—and in Sacramento, about fifty miles from Contra Costa County, which was at the time the ninth-largest county in the state. Defendant, although painted as a sex molester and an ex-convict in the Sacramento community by the Sacramento press, had no particular status in the Contra Costa community. Likewise, the victims, although presented as likable all-American college students in the Sacramento press, were not prominent in the Contra Costa community.

These factors, considered as a whole, do not lead us to doubt that defendant received a fair trial. Moreover, the voir dire of the actual jurors does not establish a reasonable likelihood that defendant did not have a fair trial.

Of the 12 jurors who decided defendant's case, 10 had not been exposed to any pretrial publicity. Of the two who had (Appel and Youngman), both stated their impartiality and ability to reach decisions based on courtroom evidence. Appel vaguely recalled reading an article about college students in the Sacramento area who disappeared after going to a party. She remembered nothing more. She did not read any Sacramento newspapers, nor did she watch any television news. Youngman remembered reading one recent article in a San Francisco newspaper about the charges involved in the case, the fact that defendant's wife would testify against him, and defendant's prior record. At first she said she remembered nothing specific from the article, but then stated she may have remembered something about a prior robbery. She then stated that if it was true defendant had suffered a prior robbery conviction, she would not hold it against him, because he would already have "paid his debt" to society for that offense. Both jurors were subjected to individual voir dire on the impact of pretrial publicity, but defendant challenged neither for cause. (See *People* v. *Jurado* (1981) 115 Cal.App.3d 470, 491 [171 Cal.Rptr. 509].)

Although we have noted that a juror's declaration of impartiality is not conclusive (e.g., *Williams, supra,* 48 Cal.3d at p. 1129), here we have no basis to doubt the two jurors' assertions that they would not be persuaded by the brief news accounts they had seen. ▮▮▮ We also observe, as we held in *People* v. *Harris* (1981) 28 Cal.3d 935, 949-950 [171 Cal.Rptr. 679, 623 P.2d 240], that "'juror exposure to information about a . . . defendant's prior convictions or to news accounts of the crime with which he is charged'" does not "'presumptively deprive[] the defendant of due process.' [Citation.] 'It is not required . . . that jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion of the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'"

Having reviewed the record independently, we are convinced there is no reasonable likelihood that defendant did not receive a fair trial.

b. *Sequestration of the jury.* ▮▮▮ Defendant asserts the court erred in denying his alternative request to sequester the jury during deliber-

ations. He raises a similar point concerning the penalty phase, *post*, in part IV.9.

Whether to sequester the jury is a matter left to the sound discretion of the trial court. (§ 1121.) The record shows that after selection of the jury, and after the court denied defendant's second change-of-venue motion, defendant asked the court to consider sequestering the jury during deliberations. The court responded that it "might consider" sequestering the jury during deliberations, and defendant responded he "would request that of the court." The court replied, "Let's wait till we get to that point. We are a couple of months away from that." Because defendant offers no showing that he raised the matter when the trial approached the time for deliberations, we could justifiably consider the point waived. In any event, on these facts, no abuse of discretion appears. The court frequently admonished the jury not to discuss or read or listen to reports about the case. Defendant contends that "although no juror reported he or she disobeyed the court's orders, it stretches the imagination to believe the jury could have been successfully insulated from the extensive media coverage," and hence the court abused its discretion in failing to sequester. We decline to find an abuse of discretion based on defendant's speculation.

For similar reasons we also reject defendant's apparently separate claim that publicity during the trial so contaminated the jury that a fair trial was not had. Defendant offers no credible support for his theory.

### 5. *Jailhouse tape recordings*

The police recorded various conversations between defendant and his visitors while defendant was in jail. Defendant asserts on various grounds that these recordings were illegally obtained and used against him at trial.

a. *Statutory-right-to-privacy claim.* More than a year after the recordings were made in this case, we decided *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142]. Relying on statutory grounds, we held for the first time that the police may not monitor the conversations of pretrial detainees for the sole purpose of discovering information to use against them at trial. (*Id.*, at pp. 867-868.) We explained, however, that the police may monitor conversations to the extent "necessary to insure the security of the prison and the protection of the public." (*Id.*, at p. 868.) We subsequently held in *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24 [196 Cal.Rptr. 704, 672 P.2d 110], that *De Lancie* was not retroactive, and did not require exclusion of evidence obtained before that decision was filed. (35 Cal.3d at p. 39.) ▌ Defendant asserts *Donaldson* was wrongly decided and we should apply *De Lancie* retroactively, and

that the recordings here were not necessary to jailhouse security and should have been suppressed.

We disagree on both counts. First, defendant offers no compelling reason to depart from our retroactivity analysis in *Donaldson* v. *Superior Court, supra,* 35 Cal.3d 24. *Griffith* v. *Kentucky* (1987) 479 U.S. 314 [93 L.Ed.2d 649, 107 S.Ct. 708] notwithstanding, we have previously held that for questions of retroactivity concerning matters of state law we adhere to the test employed in *Donaldson.* (*People* v. *Carrera, supra,* 49 Cal.3d 291, 326-328.) In any event, and without belaboring the point, the record amply establishes that defendant was a major security risk while awaiting trial, that he made various plans to escape, and thus the recordings would have been permissible even under *De Lancie, supra,* 31 Cal.3d 865, to assist in jailhouse security.

b. *Fifth Amendment claim.* ██ Defendant suggests the recordings violated his Fifth Amendment right to remain silent in the face of custodial interrogation. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) As the People observe, defendant's sole authority for this view has been reversed by the high court (see *Arizona* v. *Mauro* (1987) 481 U.S. 520, 530 [95 L.Ed.2d 458, 107 S.Ct. 1931]). Accordingly, and because it is clear that defendant's conversations with his own visitors are not the constitutional equivalent of police interrogation, we reject the claim. (See, e.g., *People* v. *Williams* (1988) 44 Cal.3d 1127, 1140-1141 [245 Cal.Rptr. 635, 751 P.2d 901] [rejecting same claim even as to information obtained by undercover inmate agent].)

c. *Sixth Amendment claim.* ██ Defendant insists the recordings were obtained in violation of his right to counsel. He cites familiar high court cases dealing with use of government informants to elicit incriminating information from a defendant in violation of his right to counsel (e.g., *Kuhlmann* v. *Wilson* (1986) 477 U.S. 432 [91 L.Ed.2d 364, 106 S.Ct. 2616]), but fails to recognize that none of his visitors was a government agent sent in to elicit information from defendant. We reject this claim as well (see, e.g., *Williams, supra,* 44 Cal.3d at pp. 1141-1142).

d. *Improper prosecutorial discovery.* ██ Finally, defendant cites *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], for the proposition that the recordings constituted improper prosecutorial discovery in violation of his Fifth Amendment right against self-incrimination. *Prudhomme* and its progeny, however, apply to formal discovery orders in favor of the prosecution. Here there was no such order; nor were defendant's statements to his visitors "compelled." We reject the claim.

### 6. *Admissibility of the Vaught/Scheffler "other crimes" evidence*

As noted above, defendant admitted killing Miller, but denied an intent to kill, asserting he experienced diminished capacity at the time. He denied killing Sowers, and denied his motive was to rape Sowers. In order to prove defendant's intent and motive, and to disprove his diminished capacity claim, the prosecution sought to introduce evidence of the Vaught/Scheffler killings. After extensive hearings, the court ruled it would admit the "other crimes" evidence for the stated purposes (to prove intent and motive, and to disprove diminished capacity), but not to prove identity. Defendant presented rebuttal evidence tending to show that others—two Black men in a maroon Firebird—committed the Vaught/Scheffler killings. ▮▮▮ He now asserts the court erred in holding admissible the evidence concerning the Vaught/Scheffler killings.

We recently considered similar claims in *People* v. *Robbins* (1988) 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355], in which the defendant similarly admitted the act of killing his victim, but denied intent to kill or intent to engage in lewd conduct with his victim. ▮▮▮ We held, " '[a]s with other types of circumstantial evidence, . . . admissibility [of "other crimes" evidence] depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence.' " (*Id.*, at p. 879, italics in original, quoting *People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883].)

▮▮▮ Defendant admitted the Miller killing but denied intending to kill him because of diminished capacity; he asserted his sole intent was to rob. Under these circumstances, defendant's intent and motivation were disputed material issues. (See *People* v. *Kelly* (1967) 66 Cal.2d 232, 242-243 [57 Cal.Rptr. 363, 424 P.2d 947].)

The evidence was also relevant to those disputed issues. ▮▮▮ As we explained in *Robbins, supra*, 45 Cal.3d at pages 879-880, "[T]o be relevant, an uncharged offense must tend logically, naturally and by reasonable inference to prove the issue(s) on which it is offered. [Citations.] We have long recognized 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance' [citations], and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution." (45 Cal.3d at p. 879; see *id.*, at pp.

879-880, quoting Wigmore's explanation of the use of "other crimes" evidence.)

 The Vaught/Scheffler crimes were "substantially similar" (see *Robbins, supra*, 45 Cal.3d at p. 880) to the charged offenses, and hence sufficient to raise an inference that the charged offenses were committed with the charged intent(s). First, and contrary to defendant's suggestion, the fact that the trial court believed the crimes insufficiently similar to justify their use to prove identity, did not preclude the court from concluding they were sufficiently similar to establish intent. As we noted in *Robbins, supra*, "when evidence of an uncharged offense is introduced to prove intent, the prosecution need not show the same quantum of 'similarity' as when uncharged conduct is used to prove identity." (*Ibid.*)

Second, as to both sets of crimes, the evidence showed defendant forced Charlene to drive to a mall in Sacramento to undertake a "hunt" for young women and lure the victims into his vehicle; he tied the victims' hands behind their backs; he took them to rural locations, removed them from Charlene's presence, and took them to a separate spot for execution. Each victim was shot in the head at point-blank range with a handgun, and each time defendant and Charlene threw the gun into the Sacramento River on the day after the killings. This evidence amply supports the trial court's implicit conclusion that the uncharged crimes tended logically, naturally, and by reasonable inference to prove defendant's intent and motive in the charged crimes. (See *Robbins, supra*, 45 Cal.3d at p. 880.)

Finally, we reject defendant's suggestion the trial court abused its discretion in failing to exclude the "other crimes" evidence under Evidence Code section 352, or any other similar rule or policy. We specifically reject defendant's suggestion that the evidence was inadmissible simply because there may have existed independent evidence sufficient to sustain the People's claim that defendant had the intent to kill. (See Comment, *A Proposed Analytical Method for the Determination of the Admissibility of Evidence of Other Offenses in California* (1960) 7 UCLA L.Rev. 463, 482.) Defendant admitted killing Miller, but denied any intent to kill, and presented a formal diminished capacity defense. Under these circumstances we are not prepared to say the trial court erred in its implicit conclusion that the "other crimes" evidence was necessary to prove defendant's intent; nor are we prepared to say, as defendant appears to suggest, that the "other crimes" evidence was cumulative on this point, or that the trial court abused its discretion in concluding the probative value of the evidence on this crucial point outweighed its prejudicial effect.

### 7. *Testimony of Charlene's attorney*

As noted above, defendant asserted Charlene simply fabricated her testimony against him. To prove this point, he questioned why Charlene had waited so long to tell anyone—including her original attorney—about the crimes, and he suggested that she invented her testimony in order to escape primary responsibility for the charges. To rebut this claim the prosecution presented the testimony of Hamilton Hintz, Charlene's second attorney. Through Hintz's testimony the prosecution was able to show that Charlene disclosed her full knowledge of the various crimes to Hintz (and his cocounsel, Fern Laetham) because she was impressed with Hintz's background, and trusted him. Defendant, reasserting his numerous objections to Hintz's testimony at trial, claims the testimony was irrelevant and hearsay.

a. *Relevance.* Without offering any apposite citation, defendant asserts Hintz's testimony concerning his background and qualifications was irrelevant. The court ruled otherwise, concluding it was relevant to show why Charlene trusted and ultimately elected to confide in Hintz, when she had not confided in others. We find no basis to question the court's exercise of its "wide discretion" on this issue. (See *People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].)

b. *Hearsay.* As noted above, Hintz testified that Charlene confessed to him her involvement in defendant's various killings, and implicated defendant in each of the killings. On cross-examination of Charlene, defendant repeatedly suggested she implicated him only because she had "made a deal" with the prosecutor. To prove she implicated him before any "deal" with the prosecutor was contemplated, the People offered Hintz's testimony about Charlene's prior consistent statements to Hintz. (See Evid. Code, § 791, subd. (b), authorizing evidence of a declarant's prior consistent statements if, "An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen.")

 We are reluctant to question the trial court's apparent determination that Charlene's revelations to Hintz were made "before the bias, motive for fabrication, or other improper motive is alleged to have arisen." But even assuming the court erred in this regard, we find no reasonable probability the verdict would have been different without Hintz's testimony about Charlene's prior statements. Charlene's testimony, together with the other evidence outlined above, convincingly established defendant's guilt of the various crimes.

### 8. *Cross-examination of Charlene*

■ Defendant, citing various record passages, asserts the court improperly restricted his cross-examination of Charlene. The record clearly shows that the court did not "restrict" defendant's cross-examination, but merely cautioned defendant that if he persisted in asking certain questions, he might open the door to admission of various other crimes. For example, defendant asked Charlene why she was not relieved when she discovered the police waiting for her at her parents' house after the Miller/Sowers killings. Charlene requested a discussion in chambers, at which time the prosecution observed that in order for Charlene to answer the question she would have to reveal that this was not the first, but the tenth murder she had participated in with defendant. Defendant said he would withdraw the question.

In each cited instance, both the court and the prosecutor advised defendant for his own protection and benefit that his questions might open the door to other crimes. The court never prevented defendant from asking the questions at issue, it only cautioned him against exercising his right to do so. We find no support for defendant's claim.

### 9. *Testimony of defendant's assault on Charlene*

Charlene's mother testified that defendant married Charlene in 1978, and again in 1980, and that after the second marriage defendant assaulted Charlene at their Sacramento apartment. Defendant unsuccessfully objected to this evidence on grounds it was irrelevant, and more prejudicial than probative under Evidence Code section 352. Defendant renews those claims, and further asserts the testimony should have been excluded as improper character evidence.

a. *Character evidence.* ■ Because defendant did not object on the ground of improper character evidence, the issue may not be raised now. (*People* v. *Privitera* (1979) 23 Cal.3d 697, 710 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178].) In any event the record discloses the testimony was introduced not to establish defendant's bad character, but to help explain the relationship between defendant and Charlene.

b. *Evidence Code section 352.* ■ Again, the evidence was probative to explain defendant's relationship with Charlene, and why she would agree to help lure and kill his victims. It also explained and corroborated Charlene's statements that she feared defendant. In light of the other properly admitted evidence in this case, the trial court did not err in concluding this testimony was not unduly prejudicial.

c. *Relevance.* ▉ Defendant suggests the trial court had a sua sponte duty to instruct the jury that the testimony was to be used for a limited purpose, and should have cautioned the jury against misusing the testimony. He complains failure to do so allowed the jury to "consider a single prior act as evidence of defendant's violent character." Defendant offers no authority for the proposition that a sua sponte duty existed in this situation, and we decline to create one. In any event, on this record we cannot believe this "single prior act" was a crucial factor in the jurors' minds as they deliberated defendant's guilt.

10. *Testimony of Mike Wasserman*

Mike Wasserman and Andy Beal were fraternity brothers of Craig Miller, and were with him and Mary Beth Sowers at the shopping center on the night of their abduction. As noted above, Beal noticed Miller and Sowers in defendant's car, and approached them. Miller swore at Beal and told him to leave; Charlene slapped Beal, and defendant's car was driven away. Immediately thereafter Wasserman approached Beal in the parking lot, and observed that Beal, normally not an excitable person, was "uptight" and "surprised," and it "appeared his adrenalin was flowing." Beal told Wasserman, "You're not going to believe what happened." He recounted the above events, and as he finished he saw defendant's car being driven out of the parking lot and exclaimed, "There is the car they're in. That's the car."

Beal was hypnotized by the police before the preliminary hearing, and his testimony was excluded at trial pursuant to *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354]. Over defendant's objection the court allowed Wasserman's testimony concerning the above statements under the spontaneous declaration exception to the hearsay rule, and also ruled the testimony would not violate defendant's confrontation rights. Defendant reasserts his objections.

a. *Spontaneous declaration.* ▉ Under Evidence Code section 1240 a statement is not inadmissible under the hearsay rule if it "Was made spontaneously while the declarant was under the stress of excitement caused by such perception." We believe Beal's statement falls plainly within the exception. It was clearly a startling event; his friend Miller swore at him, telling him to leave, and a strange woman slapped him in the face. Beal appeared surprised, excited, and puzzled. He made the statement to Wasserman while defendant's car was still in the parking lot, and while he saw it depart. We conclude the court did not abuse its discretion in admitting the evidence as a spontaneous declaration. (See, e.g., *People* v. *Poggi* (1988) 45 Cal.3d 306, 317-320 [246 Cal.Rptr. 886, 753 P.2d 1082].)

b. *Confrontation.* ▮ Defendant cites no case in which we or the high court have held admission of a spontaneous declaration violates a defendant's confrontation rights under California or federal Constitutions. In a number of cases the high court has made clear that the focus of its concern "has been to insure that there 'are indicia of reliability . . .' . . . to 'afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement.'" (*Mancusi* v. *Stubbs* (1972) 408 U.S. 204, 213 [33 L.Ed.2d 293, 301, 92 S.Ct. 2308].) Later, in *Ohio* v. *Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 608, 100 S.Ct. 2531], the court held this reliability "can be inferred without more . . . where the evidence falls within a firmly rooted hearsay exception." We agree with our Court of Appeal that "the spontaneous declaration exception meets this requirement" (*In re Damon H.* (1985) 165 Cal.App.3d 471, 478, fn. 8 [211 Cal.Rptr. 623]), and hence we reject defendant's confrontation claim (see *People* v. *Farmer* (1989) 47 Cal.3d 888, 905-906 [254 Cal.Rptr. 508, 765 P.2d 940]).

In any event, even if we did not follow the *Roberts/Damon H.* approach, we believe the facts of the declaration in this case establish the requisite reliability. (See *Dutton* v. *Evans* (1970) 400 U.S. 74, 88-89 [27 L.Ed.2d 213, 226-227, 91 S.Ct. 210] [plur. opn.] [listing "indicia of reliability" relevant to determining reliability of declaration introduced against confrontation clause challenge]; *Mancusi* v. *Stubbs, supra*, 400 U.S. at p. 213 [33 L.Ed.2d at p. 302] ["some of these 'indicia of reliability' referred to in *Dutton*" must be present for the hearsay to be admissible over confrontation objections].) Beal's explicit description of the incident—which he recounted to Wasserman immediately after the events, and while the car was being driven away—was based on Beal's firsthand knowledge, thus making remote the possibility it was the product of faulty recollection. The spontaneous nature of the statement is evident from the fact that it followed immediately after a bizarre and traumatic experience. Additionally, the evidence was fully corroborated by Charlene, a percipient witness.

11. *Marital communication privilege*

▮ Defendant renews his claim that Charlene's testimony should have been excluded under the privilege for confidential marital communications (Evid. Code, § 980), and that her testimony was not within "crime or fraud" exception (*id.*, § 981), under which the privilege does not apply if the communication was made to "enable or aid" the commission or planning of a crime or fraud. We need not dwell on the latter claim, because it is clear that whatever their nature, defendant's communications with Charlene were not *marital* communications. The record shows defendant was married to Carol Turks in Nevada in 1967, and that he never legally dissolved that marriage. Defendant's subsequent marriages to Charlene were illegal

and void (see Civ. Code, § 4401), and thus he had no right to assert the marital privilege. (See, e.g., *People* v. *Mabry* (1969) 71 Cal.2d 430, 439-440 [78 Cal.Rptr. 655, 455 P.2d 759], and cases and authorities cited.)

## 12. *Blood type testimony*

As noted above, an expert testified he tested stains on Scheffler's clothing, and he found "type A" antigen of the AOB system in the semen recovered from Scheffler's panties (see generally *People* v. *Brown* (1985) 40 Cal.3d 512, 529 et seq. [220 Cal.Rptr. 637, 709 P.2d 440] [explaining the technology]). Because Scheffler had "type O" blood, the expert concluded the "type A" antigen was contributed by the semen. Scheffler's husband was a "type O" positive secreter, and defendant was a "type A" positive secreter. The testimony showed defendant could have deposited the semen found on Scheffler, and he was within 32 percent of the male population that are "type A" positive secreters. Defendant asserts for the first time that, for two reasons, the testimony should not have been allowed.

a. *Admissibility of the blood tests.* ▮ Citing *Brown, supra*, 40 Cal.3d 512, 528-535, defendant asserts the evidence should not have been admitted because such tests have not gained general acceptance in the medical community. As in *People* v. *Coleman* (1988) 46 Cal.3d 749 [251 Cal.Rptr. 83, 759 P.2d 1260], however, we reject the claim because it was not raised below (*id.*, at pp. 776-778). In any event, as we noted in *Coleman, supra*, recent Court of Appeal decisions have rejected the identical claim on the merits. (*Id.*, at p. 778, fn. 23.)

b. *Statistical evidence.* ▮ Citing *People* v. *Collins* (1968) 68 Cal.2d 319, 328-329 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176], defendant also asserts the court erred in allowing the expert to testify that his review of the test results placed defendant within 32 percent of the male population. A similar claim was also raised in *Coleman, supra*, 46 Cal.3d at pages 776-778, and for the same reasons we reject it in this case as well.

## 13. *Admission of photographs of victims while alive*

▮ The court, without objection from defendant, admitted photographs of the various victims while alive. Contrary to defendant's suggestion, he is precluded from raising the issue now because he failed to object below. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1271 [232 Cal.Rptr. 849, 729 P.2d 115].) In any event, such an objection would have been meritless. The photographs were relevant evidence in that each was used as the basis of Charlene's identification of defendant's murder victims. We find no "clear abuse of discretion" in the trial court's ruling. (*Id.*, at pp. 1255-1256.)

### 14. *The prosecution's compliance with discovery*

While the case was still in Sacramento, defendant complained he had not received various discovery items from the prosecutor, i.e., videotapes of Charlene's interviews with the police concerning California and Oregon crimes, and some separate killings in Nevada. The court ordered the prosecution to disclose the tapes by August 6, 1982. The prosecution disclosed some of the material on that date, and the rest within a week of that date.

■ The trial court denied defendant's motion to dismiss on the ground the prosecution had failed to timely comply with discovery; instead, the court granted defendant a continuance. We find neither error nor prejudice. Nor are we convinced that the prosecution's actions amounted to reversible error under *Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], or *People* v. *Rutherford* (1975) 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341] (prosecution's duty to disclose evidence).

### 15. *Sanctions for the loss of vaginal swabs*

As noted above, the prosecution produced evidence that a pathologist found semen in Rhoda Scheffler's vagina and on her panties, and that the semen samples were of a "type A" antigen of the AOB system, from a "positive" secreter such as defendant (and unlike Scheffler's husband). This evidence, together with other testimony, tended to show that defendant raped and killed Scheffler.

After the prosecution expert testified to the above, defendant moved under *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361] to dismiss the case against him because one of the two samples—the vaginal swab—had been completely used, and was not available for testing by defendant's expert. (See *People* v. *Nation* (1980) 26 Cal.3d 169, 177 [161 Cal.Rptr. 299, 604 P.2d 1051] [police duty to preserve semen samples].) He conceded the sample on the panties was available for testing, but maintained that only the vaginal swab would allow his experts to conduct accurately a "PGM" test to help determine the donor, or a "Peptase A" test, to determine whether the donor was Black or White.

The trial court took testimony on the issue. The prosecution's expert testified that he had not conducted PGM or Peptase A testing on the body when it was discovered in 1978 because (i) the swab sample was a "mixed sample" of sperm and vaginal secretions, (ii) there was a putrefaction problem (because of decomposition of the body) and (iii) given these factors, and the "state of the art" and the laboratory's "experience and abilities at the time" with such tests, he would have had no confidence in the tests, and so

did not attempt them. The trial court found the prosecution expert had used the sample for purposes of conducting his tests, and the destruction of the swab was not malicious. It also found the evidence cumulative because defendant was still able to test the semen sample from Scheffler's panties, although he could not successfully conduct a PGM or Peptase A test on that sample, because it was by then four years old and had not been frozen. The court ruled defendant would be allowed to introduce into evidence the fact that the defense was unable to independently test the vaginal samples.

 Defendant asserts the court erred in failing to grant his motion to dismiss, or to impose more severe sanctions, such as instructing the jury that (i) the swab, which as noted above had not been tested for PGM, in fact revealed PGM activity that matched neither the victim nor defendant, or (ii) the donor of the semen was not the same race as defendant.

 As we held in *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1234 [255 Cal.Rptr. 569, 767 P.2d 1047], *Hitch*'s articulation of the prosecution's duty to preserve (see 12 Cal.3d at pp. 649, 652-653) was superseded by *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], in which the high court established the following standard: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.*, at pp. 488-489 [81 L.Ed.2d at p. 422], fn. omitted.)

 We conclude defendant's objection was not timely, and thus he may not press it now. *People* v. *Taylor* (1977) 67 Cal.App.3d 403 [136 Cal.Rptr. 640] and *People* v. *Mayorga* (1985) 171 Cal.App.3d 929 [218 Cal.Rptr. 830], involved similar delayed objections to the prosecution's destruction of evidence. The *Taylor* court stated, "once the evidence which a successful assertion of a *Hitch* issue would suppress, has been received without objection, it is too late" (67 Cal.App.3d at p. 409) and concluded, "defendant would have been entitled to no more than suppression of police testimony which might have been contradicted [by the lost evidence]. The testimony, however, was received entirely without objection. Thus defendant waived any *Hitch* claim he might have had." (*Id.*, at p. 410.)

*Mayorga, supra*, 171 Cal.App.3d 929, followed *Taylor, supra*, and held a defendant may not use a new trial motion to raise a *Hitch* claim for the first time. (171 Cal.App.3d at pp. 939-941.) *Mayorga* stated there are three methods by which a *Hitch* motion may be brought and preserved for appeal:

(i)—the most preferable method—by motion before trial; (ii) by objection to the admission of evidence at trial; and (iii)—the least preferred method—by motion to strike testimony. (*Id.*, at pp. 938-939.)

Because defendant waited until after the expert testified and the prosecution rested on rebuttal, it was obviously too late for the court to suppress the testimony. We conclude the issue is waived.

In any event, the record establishes defendant was still able to test the semen sample on the panties, and there is evidence that his own expert felt that sample would be more useful to defendant's case than the vaginal swab sample, because decomposition of the body made the swab untrustworthy. Under these circumstances defendant cannot establish the second element of the *Trombetta* test, i.e., inability to obtain comparable evidence by other reasonably available means. (*California* v. *Trombetta, supra*, 464 U.S. at p. 489 [81 L.Ed.2d at p. 422].) We would thus reject the claim on its merits.

16. *Impeachment with physical evidence obtained in violation of defendant's Miranda rights*

Defendant was arrested in Omaha, Nebraska, and interviewed by FBI agents. After being advised of his rights under *Miranda* v. *Arizona, supra*, 384 U.S. 436, he opted to remain silent. Subsequently, perhaps believing that various statements by defendant indicated his change of heart and willingness to talk, the FBI agents asked him about a locker key they had found after arresting him. Defendant responded the key was from a locker at a bus station, and that his suitcase was in the locker. Before trial defendant successfully moved to suppress the suitcase and its contents on the ground it was seized illegally.

As noted above, defendant attempted to impeach Charlene's credibility—and thus challenge her veracity—by, inter alia, exposing asserted inconsistencies in her testimony. In this regard, during his own direct testimony defendant introduced a T-shirt on which was printed the phrase, "I'm the very best," which the police confiscated from his apartment. On cross-examination defendant testified Charlene did not have that T-shirt with her when they fled to Omaha, and the T-shirt she wore when she visited her mother the morning after the Miller/Sowers killings was not in the suitcase found in Omaha.

According to defendant, the existence of this T-shirt in his apartment established an inconsistency in Charlene's version of the events. Charlene, however, also testified on cross-examination that she had "several" of the same T-shirts, and she explained that she last saw the shirt she wore on the

morning after the killings in the suitcase found in Omaha, Nebraska. Defendant continued to question her, strongly implying there was only one such T-shirt, and that Charlene must therefore be lying.

At this point the prosecution sought to introduce the second T-shirt— i.e., the one found in the suppressed suitcase—to correct the misperception created by defendant's direct testimony as well as his cross-examination of Charlene, that Charlene had only one such T-shirt, and it was the one found in defendant's apartment. After a hearing the court admitted this limited evidence of the otherwise suppressed contents of the suitcase.

Defendant asserts this ruling violated *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal. Rptr 360, 545 P.2d 272], in which we declined to follow the high court's ruling in *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], and held that under the California Constitution, statements obtained in violation of *Miranda* are inadmissible even for purposes of impeachment. He concedes the *Disbrow* rule has been abrogated by California Constitution, article I, section 28, subdivision (d) (see *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307]), but notes the crimes in this case occurred before the effective date of that constitutional amendment (see *People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149]), and hence *Disbrow* applies.

The People assert we should recognize at least one of three exceptions to the *Disbrow* rule based on (i) the FBI agents' good faith belief that defendant had changed his mind and wished to speak to them without a lawyer; (ii) the fact that impeachment would be allowed under these circumstances under the federal Constitution or the law of Nebraska, where the *Miranda* violation occurred; or (iii) the fact that the impeachment evidence was physical rather than testimonial evidence. Although there may be merit in one or more of these approaches, we decline the People's invitation because we believe it is clear that *assuming* there was *Disbrow* error, there is no reasonable probability it affected the verdict. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The dispute about the T-shirt simply pales in significance when viewed in the context of Charlene's entire testimony and the supporting independent evidence of defendant's role in the crimes. Any error concerning admission of the T-shirt was thus harmless.

17. *Asserted instructional error*

a. *Aiding and abetting instructions.* The court instructed on aiding and abetting pursuant to former CALJIC Nos. 3.00 and 3.01, one year before we held those instructions erroneous for failing to advise the jury that to be convicted as an aider and abettor the defendant must not

only "know" of the perpetrator's criminal purpose, he must also share the perpetrator's purpose or intent to commit, encourage, or facilitate the commission of a crime. (*People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318].)

As we held in *People* v. *Dyer* (1988) 45 Cal.3d 26, 59-65 [246 Cal.Rptr. 209, 753 P.2d 1], *Beeman* error is subject to harmless error analysis under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (See also *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392].) Applying that test, we conclude beyond a reasonable doubt that assuming the jury relied on the aiding and abetting instructions—a doubtful proposition in view of the strong evidence showing defendant was the perpetrator of the crimes—the *Beeman* error could not have affected the verdicts.

Although the jury was instructed in the pre-*Beeman* language of former CALJIC Nos. 3.00 and 3.01, it was also instructed pursuant to CALJIC No. 8.80, which requires the jury to find that the defendant, if not the actual killer, acted with intent to aid the actual killer in the commission of murder in the first degree. Accordingly, as the Court of Appeal held in *People* v. *Gonzales* (1986) 192 Cal.App.3d 799, 806-808 [238 Cal.Rptr. 554], and as we have held in similar circumstances in recent cases (e.g., *People* v. *Warren* (1988) 45 Cal.3d 471, 486-488 [247 Cal.Rptr. 172, 754 P.2d 218] [sustaining felony-murder special-circumstance findings]), the intent element omitted under former CALJIC Nos. 3.00 and 3.01 was necessarily posed and decided adversely to defendant in CALJIC No. 8.80. (See *Gonzales, supra*, 192 Cal.App.3d at p. 808.) In addition, the facts of this case establish defendant's purpose or intent to commit a crime beyond a reasonable doubt. No reasonable trier of fact, having found defendant personally used a firearm in the Miller/Sowers killings, and having found he had the requisite knowledge under the former aiding and abetting instructions, could also have concluded that he did not act for the purpose of facilitating or encouraging the crime. (See *People* v. *Leach* (1985) 41 Cal.3d 92, 105-106 [221 Cal.Rptr. 826, 710 P.2d 893].)

 b. *CALJIC No. 2.62.* At both the prosecutor's and defendant's request, the court instructed the jury pursuant to CALJIC No. 2.62, which concerns inferences to be drawn from the defendant's failure to explain or deny evidence against him in his own testimony. ▮ He now asserts the court erred in giving the instruction because it was assertedly unsupported by the evidence. Although we have serious doubts about the latter proposition, we need not address it because defendant invited the instruction—and any resulting assumed "error"—and cannot raise the issue now. (*People* v. *Wickersham* (1982) 32 Cal.3d 307 [185 Cal.Rptr. 436, 650 P.2d 311].)

Defendant asserts the record contains no express articulation of his tactical basis for requesting the instruction, and hence the invited error rule does not apply. (See *Wickersham, supra,* 32 Cal.3d at p. 332.) But as we recently held in *People* v. *Marshall* (1990) 50 Cal.3d. 907, 932 [269 Cal.Rptr. 269, 790 P.2d 676], that requirement applies only when the court is under a sua sponte duty to instruct in a manner other than it did. Here the trial court had no sua sponte duty to instruct using CALJIC No. 2.62, and hence *Wickersham, supra,* as recently explained in *Marshall, supra,* fully supports a finding of invited error.

c. *CALJIC No. 9.20.* Defendant was charged with two counts of "simple" kidnapping in violation of section 207, a general intent crime. Section 209, subdivision (b), sets out the separate crime of kidnapping for robbery. Apparently on the basis of defendant's trial testimony, in which he admitted kidnapping Miller and Sowers to rob them, and on the basis of Charlene's testimony concerning defendant's conduct with Sowers, the court instructed the jury pursuant to CALJIC No. 9.20, which covers kidnapping in connection with the commission of an underlying offense—in this case, rape or robbery. The court also instructed on general intent on the kidnapping charge (CALJIC No. 3.30).

Defendant, citing *People* v. *Hill* (1983) 141 Cal.App.3d 661 [190 Cal.Rptr. 628], asserts the court prejudicially erred by failing to instruct on "simple" kidnapping pursuant to CALJIC No. 9.19, and instead instructing pursuant to CALJIC No. 9.20. *Hill* stands for the proposition that CALJIC No. 9.20 is inappropriate when, as here, one of the underlying charges is robbery. (141 Cal.App.3d at p. 667.) Other than this, however, *Hill* does not assist defendant. The *Hill* court's reversal was premised on a number of instructional errors not present in this case, and, contrary to defendant's suggestion, was not based on the mere fact that the trial court instructed pursuant to CALJIC No. 9.20 on the section 207 charge. (See 141 Cal.App.3d at pp. 667-669.) On this record it is impossible to imagine how defendant was prejudiced by the court's instruction on the "aggravated" crime; at most, it required the prosecution to meet a higher burden than it needed to. *Hill, supra,* establishes no basis for reversal.

d. *Refusal to instruct on involuntary intoxication.* The court instructed the jury on voluntary intoxication and unconsciousness, but refused to give CALJIC No. 4.23, concerning involuntary intoxication. By his own testimony, defendant voluntarily consumed alcohol and drugs in the early morning hours prior to the killings, but he asserts PCP was secretly given to him while he was taking other illegal drugs. █ Assuming this was true, it would not support an involuntary intoxication instruction. (*People* v. *Velez* (1985) 175 Cal.App.3d 785, 795-797 [221 Cal.Rptr. 631],

and cases cited [involuntary intoxication not established when defendant knowingly ingests unlawful substance not realizing it contains another, different illegal drug].) We conclude the record contains insufficient testimony from which reasonable jurors could have concluded defendant was involuntarily intoxicated. (See *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].)

e. *Refusal to instruct on justifiable homicide.* The trial court instructed that unreasonable belief in the need to defend against great bodily injury would reduce defendant's crime to manslaughter, but refused to instruct on justifiable homicide. Contrary to defendant's view, there was no basis for such an instruction.

Defendant asserted that after kidnapping Miller and Sowers, and forcing Miller from the car at gunpoint, Miller attacked him and he shot Miller in self-defense, and that by failing to so instruct the jury, the court unconstitutionally denied him the opportunity to present his defense. We disagree. The court did not deny defendant a defense; rather, his claims simply do not amount to a defense. There is no evidence in the record supporting a reasonable belief that defendant or Charlene stood in deadly peril from Miller. Assuming Miller tried to escape by assaulting defendant and Charlene, defendant had no right to respond with deadly force, and indeed—as the aggressor—had a duty to retreat. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 215 [152 Cal.Rptr. 141, 589 P.2d 396].) The trial court correctly declined to give the requested instructions.

18. *Asserted misconduct*

a. *The terms of Charlene's plea bargain.* Before addressing the claims, some background is necessary. In late June 1982, Charlene entered into plea negotiations with prosecutors from California, Nevada and Oregon concerning 10 murders in which she implicated defendant. Eventually she entered into a plea bargain under which she agreed to testify fully, accurately and fairly in defendant's trials.

Under the agreement Charlene was to plead guilty to the first degree murders of Miller and Sowers, and be sentenced to a fixed term of 16 years, 8 months in prison, with no time off for good behavior. The agreement contemplated that the Board of Prison Terms (BPT)—which was not a party to the contract—would schedule a hearing one year after the date of Charlene's sentencing. The agreement contained a "backup" provision to take effect if the BPT declined to ratify the agreed sentence within that time. In that event, Charlene's California plea would be deemed involuntary and vacated, and she would be transferred to Nevada to plead guilty to a crime

there, and serve a determinate term of 16 years, 8 months, if that plea was acceptable to the Nevada authorities. If neither the BPT nor Nevada would limit Charlene's term to 16 years, 8 months, the pleas in both states would be deemed involuntary, and vacated, and Charlene would have the right to a jury trial or she could plead to related offenses with sentences that would amount to 16 years and 8 months' imprisonment. After the various prosecutors and Charlene, through her attorneys, agreed to the plea, Charlene pleaded guilty to two counts of first degree murder in November 1982, and was sentenced. By the terms of the agreement, the BPT was to hold its hearing and "ratify" the sentence by November 1983.

This agreement was fully explained to the jury during Charlene's testimony, and the testimony of her attorney, Hamilton Hintz. Thereafter in February 1983, in conformity with the agreement's backup provision, Charlene pleaded guilty to second degree murder in Nevada, and was sentenced to 16 years, 8 months in prison.

In mid-June 1983 the BPT—since reconstituted with new members—wrote to the Sacramento prosecutor informing him that at its May 1983 meeting it had decided it would not hold a parole consideration hearing for Charlene by November 1983, but instead, pursuant to statutory directives, would not consider the question until Charlene had served 15 years and 7 months of her term, i.e., June 1996. Charlene moved to dismiss her California plea. At an April 1984 hearing on the motion (made part of the record in this case on defendant's motion), the prosecutor testified he had always expected the BPT to ratify the California plea bargain, based on his conversations with the former director of the BPT. He asserted he first learned of the board's decision not to hold an early hearing in the June 1983 letter, and that there had been an innocent misunderstanding between him and the BPT about the BPT's ability to hold a hearing to ratify the sentence within a year of sentencing. Over the prosecutor's objections the court dismissed Charlene's plea pursuant to the terms of the agreement, and dismissed the information concerning the California charges. Pursuant to the agreement's backup provision, however, Charlene's position remained for all practical purposes the same. She was still sentenced to a 16-year, 8-month prison term, albeit under Nevada rather than California jurisdiction.

We reject defendant's suggestion that the prosecution failed in its duty to disclose the terms of the plea agreement at defendant's trial. (See *Brady* v. *Maryland, supra*, 373 U.S. 83, 87 [10 L.Ed.2d at pp. 218-219].) Defendant insists, however, that the prosecution misled the jury by failing to disclose that the BPT would reject the plea agreement by refusing to hold a parole consideration hearing within a year of the sentence, in November 1983.

Defendant suggests the June 1983 letter establishes the prosecutor, contrary to his testimony, knew as early as June 1982 that the BPT would not honor the agreement's condition concerning ratification within a year of sentencing. The letter to the trial prosecutor states: "The Board appreciates the difficult and sensitive negotiations the parties went through in reaching this agreement. Although the Sacramento District Attorney did meet with the [Board of Prison Terms] Chairman and Executive Officer on June 29, 1982, the Chairman made clear at that time that Mrs. Gallego would not be considered for parole until she had served fifteen years, seven months (June 1996) and that he would only recommend to the panel considering Mrs. Gallego for parole that she be released after serving sixteen years and eight months." Additionally, as inferentially disclosing the prosecutor's knowledge of the BPT's likely action, defendant quotes a July 1982 confidential memo to the file, in which the BPT executive officer memorialized both his and the BPT chairman's meeting with the trial prosecutor in this case. The memo notes that the present board cannot legally bind future boards to parole decisions, that "the release decision would not be made for 16 years," and that although the present board would recommend release on the "minimum eligible parole date," it "is clearly acknowledged, however, that an actual decision on release would be made by the Board having jurisdiction at the time, namely 16 years from the date of conviction."

We find no reason to doubt the prosecutor's testimony at the April 1984 hearing, that there had simply been a misunderstanding between him and the BPT. In any event, we fail to perceive how the prosecution's alleged suppression of BPT's refusal to ratify Charlene's sentence prejudiced defendant. Under the terms of the agreement as explained to the jury, Charlene pleaded guilty and agreed to testify and assist the prosecution in return for a fixed sentence of 16 years, 8 months. Pursuant to the terms of the agreement, that is precisely what Charlene ended up with, and the jury was not misled about the "inducement" offered for her cooperation.

b. *"Forum shopping."* ▮▮▮▮ Defendant asserts the prosecutor and Charlene's attorneys sought out Sacramento Superior Court Presiding Judge Virga—who was not the trial judge assigned to the case—to preside over the taking of Charlene's plea, and that the jury was misled by not being so apprised. Preliminarily, as the People note, defendant earlier attempted to obtain a writ of mandate to challenge Charlene's plea on this ground, and the Court of Appeal denied relief on the basis, inter alia, that defendant lacked standing to challenge entry of Charlene's plea. The parties argue whether this ruling is law of the case. In any event, however, we fail to perceive how defendant's charge, if true, enhanced the credibility of Charlene's testimony, or prejudiced defendant.

c. *Misconduct during argument.* During defendant's closing argument the following occurred:

DEFENDANT: "The district attorney wants you to believe that I did the Vaught/Scheffler murders as Charlene told you. I'd like to point out to you that I'm not charged with these crimes.

"Charlene made her deal with the district attorney sometime in June I believe . . . and this is March of the next year, and I am not charged, and to have someone implicate me in murder and not give me a jury trial is not fair, and I demand a jury trial."

THE PROSECUTOR: "You got it."

DEFENDANT: "I demand to be tried on each and every charge."

THE PROSECUTOR: "I will do that."

DEFENDANT: "In front of a jury, in front of a judge. [¶] All right. He might sit over there and laugh, like he has or will, but he hasn't, and that's a fact."

██ Defendant asserts the prosecutor committed misconduct. As the People observe, however, defendant failed to object, and cannot raise the issue on appeal because on this record a timely admonition would have cured any harm. (*People* v. *Green, supra,* 27 Cal.3d 1, 34.) In any event, on this record any misconduct was plainly harmless.

d. *Misconduct by courtroom staff.* ██ Defendant complained to the court that the bailiff, a sheriff's deputy, and Charlene's attorney would stand up as if expecting an attack each time he approached Charlene on cross-examination. The court agreed defendant should be treated "like a lawyer" until he proved he deserved to be treated otherwise, and directed everyone to remain seated during his cross-examinations in the future.

Defendant asserts the court erred in failing, sua sponte, to caution the jury to ignore the past conduct described above. Defendant cites no authority establishing such a sua sponte duty. We perceive no error.

e. *Juror misconduct.* ██ After the guilt phase instructions were delivered, two jurors—Schindly and Youngman—asked to communicate with the court. Schindly revealed that a month earlier he had begun to read an article that mentioned defendant's father had been executed. He did not

finish the article, but he did tell Youngman about it, and together they decided to inform the court.

On examination, both jurors repeatedly, expressly, and unambiguously stated that their knowledge from the article would not affect their ability to deliberate fairly and remain impartial. The prosecutor stated he did not believe the information would prevent the jurors from being fair, and the trial court agreed the problem was "de minimis," but nevertheless decided to permit defendant to consider over a three-day weekend whether he wished to have the two jurors replaced with alternates. On his return to court after the weekend, defendant stated, "My position, Your Honor, is that I feel that the damage is prejudicial, but I feel that—I feel their honesty in coming forth would nullify any damage, and I would ask that they stay on." The court stated it felt the damage was not prejudicial, and that it would do nothing as long as defendant had no objection.

Contrary to defendant's suggestion, there is no basis in the record to conclude that the court and/or prosecutor "tricked" him into waiving removal of the jurors. Defendant's waiver at trial precludes his claim on appeal. (See *People* v. *Wilson* (1965) 235 Cal.App.2d 266, 280-281 [45 Cal.Rptr. 267].) Moreover, in view of the jurors' testimony, we are satisfied defendant was not prejudiced in any event by the misconduct.

### 19. *Adequacy of the information*

The information (in the short form prescribed by sections 951 and 952) charged defendant with two counts of murder under section 187 and two counts of kidnapping, together with two special circumstance allegations respecting each murder count: multiple murder, and murder in the commission of a kidnapping. The trial court instructed on conspiracy, and informed the jury it could find defendant guilty of first degree murder on either a premeditated and deliberate theory, or on a felony-murder theory. ▮▮▮▮ Defendant asserts the information failed to put him on notice that the prosecution planned to proceed on a conspiracy or felony-murder theory.

Contrary to defendant's view and the numerous federal cases he cites, we have long held that conspiracy need not be pleaded (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 788 [248 Cal.Rptr. 126, 755 P.2d 310]). Similarly, we have long held that a pleading charging murder adequately notifies a defendant of the possibility of conviction of first degree murder on a felony-murder theory. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 751, fn. 11 [175 Cal.Rptr. 738, 631 P.2d 446] ["a defendant, charged with murder, is on notice that the prosecution may seek to prove that charge by showing that

the homicide occurred during the commission of an enumerated felony"]; *In re Walker* (1974) 10 Cal.3d 764, 781 [112 Cal.Rptr. 177, 518 P.2d 1129]; *People* v. *Golston* (1962) 58 Cal.2d 535, 539 [25 Cal.Rptr. 83, 375 P.2d 51]; *People* v. *Witt* (1915) 170 Cal. 104, 107-108 [148 P. 928].)

We nevertheless recognized in *Murtishaw* that "an information which complies with sections 951 and 952 may not in some cases give sufficient notice to conform with constitutional requirements." (29 Cal.3d at p. 751, fn. 11.) Defendant, citing *Sheppard* v. *Rees* (9th Cir. 1989) 909 F.2d 1234, asserts he was afforded constitutionally inadequate notice of the prosecution's felony-murder theory in this case, and that *Sheppard* requires reversal. We disagree.

 As *Sheppard* observes, "The Sixth Amendment guarantees a criminal defendant a fundamental right to be clearly informed of the nature and cause of the charges in order to permit adequate preparation of a defense. [Citations.] 'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court— are basic in our system of jurisprudence.'" (909 F.2d at p. 1236, fn. omitted.) Based on the state's concession that the defendant in *Sheppard* was afforded constitutionally inadequate notice (*ibid.*), the court granted Sheppard habeas corpus relief. (*Id.*, at pp. 1237-1238.)

Contrary to defendant's view, this case is unlike *Sheppard,* and does not reveal an "ambush" by the prosecution. The *Sheppard* court observed, "[a]t no time during pretrial proceedings, opening statements, or the taking of testimony was the concept of felony-murder raised, directly or indirectly." (909 F.2d at p. 1235.) In the present case, by contrast, defendant himself testified that the murders were committed while he and Charlene were engaged in a robbery. In addition, the *Sheppard* court noted that after each side rested both parties "submitted and argued their requested jury instructions to the court. Again, there was no mention by the prosecutor of felony murder." (*Ibid.*) The result, as expressed by defense counsel in *Sheppard* on the morning of closing argument, was an "ambush": " '[S]uddenly, after we've already gone over all the instructions, we've gone home and prepared our arguments, the time comes to argue the case, [and the prosecutor] is submitting a felony-murder theory." (909 F.2d at p. 1236.) In the present case, by contrast, the prosecution submitted felony-murder instructions along with the other instructions, avoiding the "ambush" situation faced by the defendant in *Sheppard.* We conclude defendant was not denied the notice guaranteed him under the Constitution.

20. *Sufficiency of the evidence*

As noted above, the prosecution proceeded on two theories of first degree murder: (i) premeditated and deliberate, and (ii) felony murder based on

robbery and/or rape. Defendant asserts the evidence is insufficient to support either theory. ■ We will sustain the convictions if, after reviewing the record in the light most favorable to the judgment, we conclude that a rational jury could have found the crimes proved beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 575-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) In this case, the evidence is sufficient to sustain defendant's conviction under either or both theories.

 a. *Premeditated and deliberated first degree murder.* ■ The record establishes defendant's planning activity, motive, and preconceived design to kill, and thus strongly supports a finding of premeditated and deliberated first degree murder. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].)

 Defendant's planning is clear from the record. He informed Charlene he wanted her to "get [him] a girl," and, armed with a gun, they set out to look for victims. At gunpoint he ordered Miller and Sowers into his car, drove them to a rural area, ordered Miller to remove his shoes, and shot him three times in the head at point-blank range. Back at his apartment, after he was finished with Sowers, he took her to another rural area and executed her as well. Charlene's testimony about these events was corroborated by expert witnesses and other circumstantial evidence. Likewise, the record discloses defendant's motive. He kidnapped the victims to fulfill his sexual fantasy, and killed both to avoid detection. Finally, the manner of killing demonstrates a preconceived design to kill. He shot both victims execution-style at point-blank range after first taking them to secluded rural areas.

 b. *First degree felony murder.* ■ The record also establishes that defendant harbored the specific intent to commit both robbery and rape (§ 189), and that the homicides occurred during the commission of these crimes. (*People* v. *Fonville* (1973) 35 Cal.App.3d 693, 706 [111 Cal.Rptr. 53].)

 Defendant expressly admitted his intent to rob Miller, and the evidence that he asked Miller for money—and then ordered him to relinquish his wallet—supports defendant's admission. He also had the intent to rape. As noted above, his goal was to "get me a girl." After killing Miller he returned with Sowers to his apartment. During the drive back he embraced her and told her, "You are going to be my Mary Ellen tonight." He took her into the bedroom, and for some time Charlene could hear the headboard of the bed knocking against the wall. Sowers emerged from the bedroom with her hands tied, and was driven to her execution. We find ample evidence of defendant's intent to commit both felonies, and the evidence plainly establishes the homicides occurred "during the commission" of both crimes.

21. *Introduction of uncharged offenses during the prosecution's rebuttal*

■ Defendant asserts the court erred in permitting the prosecution to introduce evidence of the Vaught/Scheffler killings during the prosecution's rebuttal, rather than in its case-in-chief. He overlooks the fact that the "other crimes" evidence became highly relevant only after defendant testified in his own defense that although he "believed" he killed Miller, he lacked intent or motive to kill Miller and/or Sowers. As we explained above (pt. II.6.), under these circumstances the "other crimes" evidence was properly admitted to prove defendant's intent and motive. We decline to find the court's decision to allow the evidence in rebuttal (but to grant defendant a three-week continuance to prepare) an abuse of discretion.

### III. *Special circumstance issues*

1. *Green error*

■ Defendant asserts the kidnappings alleged as the second special circumstance were merely "incidental" to the murders, and that under *People* v. *Green, supra,* 27 Cal.3d 1, the special circumstance finding is invalid. The record, however, discloses the kidnappings were not incidental to the murders, but were committed to facilitate defendant's separate sex-slave fantasy.

The court instructed the jury, pursuant to *Green,* that "the special circumstance referred to in these instructions is not established if the kidnapping was merely incidental to the commission of murder." We thus reject defendant's suggestion that the jury was not apprised of the *Green* requirement. We likewise reject his suggestion the evidence was insufficient to establish the *Green* requirement. The record, as set out above, contains substantial evidence showing the kidnappings were not merely incidental to the murders, and that the murders were committed to facilitate successful kidnapping and rape.

2. *Intent to kill, premeditation and deliberation*

Defendant asserts the special circumstance findings must be vacated because the court failed to instruct the jury on intent to kill. We rejected this claim in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], and in *People* v. *Poggi, supra,* 45 Cal.3d 306, 326-237, we rejected defendant's related claim that *Anderson* is not retroactive. ■ We also reject defendant's related assertion that the court erred in failing to instruct sua sponte that the jury must find the killings to be

premeditated and deliberate. There is neither statutory nor constitutional support for this asserted requirement. We conclude the special circumstance findings are valid. ■■■ We also find beyond a reasonable doubt that defendant was the actual killer, and hence the finding required by *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368], is satisfied.

## IV. *Penalty issues*

### 1. *Witherspoon/Witt*

#### a. *Granting of the People's challenges for cause.*

■■■ Defendant asserts four prospective jurors who expressed opposition to the death penalty were improperly excused for cause because they did not make it "unmistakably clear" they would refuse to impose the death penalty in all situations. (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770].) As we have held in numerous cases (e.g., *People* v. *Guzman* (1988) 45 Cal.3d 915, 954 [248 Cal.Rptr. 467, 755 P.2d 917]), the proper test for determining *Witherspoon* error is set out in *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424-426 [83 L.Ed.2d 841, 105 S.Ct. 844]. Under *Witt* the prospective juror need not demonstrate "unmistakable clarity" about his opposition, but may be excluded for cause if his views on the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424 [83 L.Ed.2d at pp. 851-852], fn. omitted.)

Defendant asserts we should not apply *Witt* "retroactively." We have applied *Witt* retroactively in numerous recent cases (e.g., *People* v. *Guzman, supra,* 45 Cal.3d 915, 954-956), and we are satisfied that our practice is in conformity with constitutional principles. We thus analyze defendant's claims pursuant to *Witt, supra,* 469 U.S. 412.

(i) *Prospective Juror Simonds.* Carole Simonds stated she "believed" in the death penalty, but her religious beliefs might prevent her from actually voting for it. On further questioning about whether she could vote to impose death, she responded: "I don't think I can," "I don't think so," and "Oh, I don't know. I don't think I could tell someone just take their life away, I don't think so." When asked if she could vote for death for Adolf Hitler, she replied, "I don't think I could. I don't know."

(ii) *Prospective Juror Moore.* Samuel Moore expressed general qualms about the death penalty, and on further questioning stated, "due to my religious belief I don't feel that I could vote for the death penalty,"

regardless of the facts of the case. He affirmed this statement twice more, telling defendant he did not believe he could vote for death even if Hitler or Attila the Hun were on trial.

(iii) *Prospective Juror Fredman*. Lucca Fredman told the court she did not believe in the death penalty, and twice affirmed, "I do believe that I could not vote for the death penalty" under any circumstances. She later told the court that even if instructed that the death penalty was a proper sentence under the law, she could not follow the law and impose death: "I really believe I couldn't. I couldn't live with myself."

(iv) *Prospective Juror Jensen*. Mark Jensen stated he did not believe he could "participate in anything that may involve putting a person to death." He thereafter affirmed three times that his conscience would not permit him to vote for death under any circumstances.

As in *Guzman, supra*, we conclude that under these circumstances "the court could properly have concluded from their responses that [the] jurors' views would 'prevent,' or at least 'substantially impair' performance of their duties as jurors at the penalty trial." (45 Cal.3d at p. 956.) We find no error under *Witherspoon, supra*, 391 U.S. 510, or *Witt, supra*, 459 U.S. 412.

b. *Denial of defendant's challenges for cause.*

In a related argument, defendant asserts in his supplemental brief that the court erred by failing to excuse for cause three jurors who were inclined toward imposition of death. As a result, defendant asserts, he was forced to use peremptory challenges to remove those jurors. Consequently he exhausted all of his challenges, and the court refused to allow him additional peremptory challenges. (See *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1087-1088 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Coleman, supra*, 46 Cal.3d 749, 770.)

Assuming for the sake of argument that the propriety of the court's ruling on defendant's "for cause" challenges is properly raised (see *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1248 [270 Cal.Rptr. 451, 792 P.2d 251]), we find no basis for reversal because we are not convinced the court erred in failing to excuse the jurors in the first instance.

(i) *Prospective Juror Werner*. John Werner gave several equivocal answers about the death penalty. He told defendant he believed the death penalty was appropriate for first degree murder, but not for "crimes of passion"; thereafter he told the prosecutor he would not automatically

vote for death, and he told the court he would "listen to the testimony" and did not consider either possible penalty to be "automatic."

(ii) *Prospective Juror Creutzinger.* On questioning by the court, Thomas Creutzinger admitted his "innermost feeling" that one convicted of first degree murder deserved the death penalty, and stated that he "thinks" he "probably" would "always vote for the death penalty." After the court explained that the jury would be instructed to consider factors in mitigation and aggravation, however, he stated he would not vote for death if he felt the mitigating evidence outweighed that in aggravation. In response to questioning by defendant, Creutzinger again expressed his feeling that first degree murderers deserve death. In response to further questions by the prosecutor and defendant, he stated he would consider the mitigating evidence in making his decision, but that it would be difficult for him to conclude a sentence less than death was appropriate for first degree murder.

(iii) *Prospective Juror Barton.* Margaret Barton told the prosecutor she believed the death penalty was appropriate in some cases, but not others. She told defendant she believed death was appropriate for first degree murder. She then told the prosecutor she would consider all the evidence in determining the appropriate penalty. She thereafter stated that death was the proper penalty for one convicted "beyond a reasonable doubt" by a fair jury that had weighed all the evidence presented it.

In *People v. Ghent* (1987) 43 Cal.3d 739, 768 [239 Cal.Rptr. 82, 739 P.2d 1250], we noted that when "equivocal or conflicting responses are elicited . . . ., the trial court's determination as to [the prospective juror's] true state of mind is binding on an appellate court." In *Bittaker, supra,* 48 Cal.3d at pages 1089 and 1091, we applied that rule to find proper a trial court's denial of a defendant's challenges for cause in the face of equivocal responses by three prospective jurors. The same rule applies, and the same result follows, here. We conclude the trial court did not err by denying defendant's challenges for cause.

2. *Admission of uncharged crimes*

■ Defendant concedes section 190.3, factor (b), specifically allows introduction of "uncharged crimes" evidence at the penalty phase, but he asserts admission of such evidence (e.g., the murders of Mochel and Aguilar) violated his due process and self-incrimination rights. In a supplemental brief he insists that, for various reasons, admission of such evidence also violates both his Eighth Amendment right to a "reliable" sentence, and his right to equal protection.

We rejected defendant's due process claim in *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-206 [222 Cal.Rptr. 184, 711 P.2d 480]; for the same reasons, we would reject his Eighth Amendment "reliability" claims as well. The high court rejected defendant's self-incrimination claim in *McGautha* v. *California* (1971) 402 U.S. 183, 213-217 [28 L.Ed.2d 711, 729-732, 91 S.Ct. 1454]. In *People* v. *Ghent, supra*, 43 Cal.3d 739, 773-774, we rejected defendant's related assertion that failure to require jury unanimity on the uncharged crimes posed a constitutional problem; we thus reject this aspect of his Eighth Amendment challenge as well. For the same reasons we reject defendant's equal protection challenge.

### 3. *Corroboration of accomplice testimony*

Pursuant to section 1111, the court instructed that Charlene's testimony must be corroborated. Defendant insists there was insufficient evidence to corroborate Charlene's penalty phase testimony about the murders of Mochel and Aguilar.

Corroboration is sufficient if it merely "tends in some degree to implicate the defendant." (*People* v. *Santo* (1954) 43 Cal.2d 319, 327 [273 P.2d 249].) As noted above, defendant's own testimony that he was present at the Sail Inn on the night of Mochel's disappearance linked him to that killing, and Charlene led the police to the exact location where the body was found. She testified they had fished earlier in the day in the location where Mochel was killed, and that Mochel's hands had been tied. When the body was found police discovered the hands were bound by fishing line. Similarly, physical evidence found at the scene of the Aguilar murders—i.e., clothing and yellow nylon rope described by Charlene—amply corroborated Charlene's testimony, and demonstrated that she had knowledge of the murder that could have been possessed only by one who was present at the killing.

### 4. *Introduction of juvenile crimes*

As noted above, by stipulation the jury was instructed on defendant's prior criminal record, including an adjudication for lewd conduct when he was 13, and an adjudication for armed robbery when he was 16. He now asserts admission of his juvenile adjudications was prejudicial error.

Defendant waived his claim by his counsel's decision to enter the stipulation. In any event, the claim—at least as to the robbery, which is clearly a violent offense—is meritless. (*People* v. *Lucky* (1988) 45 Cal.3d 259, 294-295 [247 Cal.Rptr. 1, 753 P.2d 1052] [adjudication of attempted use of force or violence as a juvenile admissible in aggravation under § 190.3, factor (b)].) The People appear to concede that the record does not demonstrate

that the lewd conduct involved attempted use of force or violence, but assert it is nevertheless admissible as a "felony conviction" under section 190.3, factor (c). Under our analysis in *Lucky, supra,* 45 Cal.3d at page 295, this view is unpersuasive; and yet, even if we assume penalty phase counsel acted unreasonably in this regard, the misjudgment was plainly harmless in light of the other properly introduced aggravating evidence in this case. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 693-696 [80 L.Ed.2d 674, 697-699, 104 S.Ct. 2052] [reasonable probability standard].)

5. *Escape attempt*

 Defendant asserts the court erred in allowing the jury to consider evidence of his escape attempt as an aggravating factor under section 190.3, factor (b). He observes that pursuant to *People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782], uncharged criminal activity involving use or attempted use of force or violence may be used in aggravation only if, beyond a reasonable doubt, the jury concludes the defendant's conduct amounted to a crime.

Although the question may be close, we are not prepared to say the escape plan evidence (*ante,* p. 155) was insufficient to meet this test. Nevertheless, assuming arguendo the evidence was insufficient to establish such a crime, we conclude its admission was nonprejudicial. We agree with defendant that in some cases, erroneous admission of escape evidence may weigh heavily in the jury's determination of penalty. In view of the properly admitted aggravating evidence in this case, however, we conclude there is no reasonable possibility that the asserted error affected the penalty verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P2d 1135].)

6. *Photographs of remains of Aguilar and Mochel*

 Defendant objected under Evidence Code section 352 to three photographs at the penalty trial. The first two concerned the Mochel murder. One photo shows a roadway, and demonstrates the difficulty of seeing the victim's remains from the roadway; the body is barely visible. The other photograph is of the same view, taken closer to the body, showing skeletal remains. The other photograph concerned Aguilar. It showed only her ankles and shoes, and her feet tied with yellow rope.

All of the photographs were relevant. The first two show that the perpetrator left the body in an area where it was unlikely to be discovered, and corroborate Charlene's testimony about the killing. The third photograph corroborates Charlene's testimony regarding the type of shoes the victim

was wearing. None of the photographs is so gruesome that we would find its admission an abuse of discretion (*Allen, supra*, 42 Cal.3d at p. 1256), and in any event on this record it is difficult to imagine that had the challenged photographs been excluded the result would have been different (*id.*, at p. 1258).

### 7. *Lack of remorse*

■ The prosecutor elicited from Charlene the fact that defendant expressed no remorse for killing Mochel despite the victim's pleas for herself and her children. Defendant asserts this testimony is inadmissible under *Boyd, supra*, 38 Cal.3d 760, 774. We have repeatedly rejected similar claims that the prosecution may not comment, in argument, on a defendant's lack of remorse. (See, e.g., *People v. Carrera, supra*, 49 Cal.3d 291, 339 ["[a] defendant's remorse or lack thereof is a proper subject for the jury's consideration at the penalty phase"].) For the same reasons, we reject defendant's contention.

### 8. *Motion to question penalty jury*

Section 190.4, subdivision (c), provides that the same jury that decided guilt and special circumstances is to decide penalty "unless for good cause shown, the court discharges that jury in which case a new jury shall be drawn . . . ." ■ At the start of the penalty phase defendant moved to question the jury to determine whether there was "good cause" for its discharge. He asserts the court erred in denying his motion.

We find no error. First, as we have held in numerous cases, the statutory preference for a single jury in capital cases is constitutionally unobjectionable. (*People v. Fields* (1983) 35 Cal.3d 329, 351-353 [197 Cal.Rptr. 803, 673 P.2d 680].) Second, although section 190.4 envisions departure from this course on a showing of "good cause," we reject defendant's speculation that because he may have conducted an inadequate voir dire at the guilt phase, and/or may have alienated the jury during the guilt trial, there existed grounds to question the jury a second time before the penalty trial.

A court does not abuse its discretion by failing to allow a disappointed defendant to conduct a fishing expedition to attempt to discover good cause when there is no independent basis to believe good cause exists.

### 9. *Motion to sequester during the penalty phase*

■ Citing distinguishable, out-of-state authority applying statutory and common law (e.g., *Lowery v. State* (Ind. 1982) 434 N.E.2d 868), de-

fendant asserts that sequestration of a capital jury should be mandatory throughout the trial, or at least during deliberations, on a defendant's request. There is no basis in our law for this proposition. As noted above, section 1121 leaves sequestration to the sound discretion of the trial court, and requires the court to admonish the jurors if it allows them to separate. This legislative rule, which under California law has long applied with equal force in capital cases (see *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1218 [249 Cal.Rptr. 71, 756 P.2d 795]) must be followed unless it violates the Constitution—a showing defendant does not and cannot make. There being no basis on which to conclude the court abused its discretion, we find no error. (*Id.*, at pp. 1219-1220.)

### 10. *Overlapping sentencing factors*

■■■ Defendant asserts the court had a sua sponte duty to modify former CALJIC No. 8.84.1 to make it clear the jury should not "double-" or "triple-count" statutory sentencing factors (a) (circumstances of the crime), (b) (uncharged criminal activity involving force or violence), and (c) (presence or absence of prior felony conviction). (§ 190.3.)

First, we have held, contrary to defendant's premise, that the jury may properly consider a single underlying event under both factors (b) and (c). (*People* v. *Melton* (1988) 44 Cal.3d 713, 764-765 [244 Cal.Rptr. 867, 750 P.2d 741].) We have also held that a jury should not "double count" under both factors (a) and (b), but we have also noted that in the absence of prosecutorial argument inviting the jury to do so, "any ambiguity in the language of the statute or [former] instructions will rarely . . . cause [] prejudice." (*Id.*, at p. 763.) Here there was no misleading argument, and we find no basis on which to conclude the jury was misled. As we have held, in these circumstances the court has no sua sponte duty to modify the instruction. (*People* v. *Kimble* (1988) 44 Cal.3d 480, 505 [244 Cal.Rptr. 148, 749 P.2d 803].)

### 11. *Failure to label each sentencing factor and delete assertedly "inapplicable" section 190.3 factors*

■■■ Defendant suggests the court erred by failing to advise the jury which of the various sentencing factors was aggravating, and which mitigating. As we have repeatedly held, the court has no such duty, because it is for the jury to make such assessments. For the same reason the court has no obligation to "edit" the statutory list of factors to delete those that defendant asserts are "inapplicable." (See *People* v. *Robbins, supra,* 45 Cal.3d 867, 890.)

## 12. *Factor (k)*

The court instructed the jury pursuant to former CALJIC No. 8.84.1, which contained the "unadorned" factor (k) of section 190.3 (instructing the jurors to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime"). It rejected defendant's suggested alternative instruction, which would have allowed the jurors to consider "any other circumstances, which in your mind reasonably mitigates the punishment [defendant] might otherwise receive, even though they are not a legal excuse for the crime." ■ In light of *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813], the court should have given defendant's instruction in order to avoid potential confusion about the jury's ability to consider defendant's mitigating evidence. But in view of other properly given instructions, and counsel's arguments, we are satisfied the jury was not misled about its ability to consider defendant's mitigating evidence.

The court instructed the jury to find mitigation if there was any substantial evidence to support mitigation, and informed the jury it could "choose" life without possibility of parole even if it failed to find mitigation. It also substantially modified former CALJIC No. 8.84.2, to read: "[If] aggravating circumstances outweigh the mitigating circumstances, you *may* impose a sentence of death, *but are not required to do so. That is, unlike during the guilt phase of this trial, you may consider humanity and mercy. . . ."* (Italics added.) The former italicized language clearly precludes any claim that the jury was misled about its sentencing discretion under *People* v. *Brown* (1985) 40 Cal.3d 512, 536-544 [220 Cal.Rptr. 637, 709 P.2d 440]. And in our view the latter italicized language reasonably conveyed to the jury its authority to consider and act on defendant's mitigating evidence.

This message was supported by counsel's respective arguments. In his opening argument the prosecutor carefully explained why defendant deserved death over life in prison, and never suggested the jury should ignore defendant's mitigating evidence. Defense counsel then recounted defendant's mitigating evidence in detail, concentrating on his troubled childhood. In his rebuttal, the prosecutor addressed defendant's mitigating evidence. He implicitly conceded that such evidence was relevant and should be considered, but told the jury it was unpersuasive, because regardless of difficult background, ultimately each person must account for his own life and conduct. We conclude, on this record, the jury was not misled about its ability to consider defendant's mitigating evidence.

## 13. *Brown error*

■ Despite the above quoted modified instructions, defendant insists the jury may have been misled about the scope of its sentencing authority.

He suggests the jury may have been led to believe that its task of "weighing" the aggravating and mitigating factors allowed it merely to count the respective factors, without having to face the normative decision of whether death was warranted in this case.

Nothing in the above quoted instructions, or counsel's arguments thereon, supports this view. Indeed, the court specifically instructed the jury not to do exactly what defendant speculates it "might" have done. The jury was told, "[Y]ou may not decide the effect [of the aggravating and mitigating] circumstances by the simple process of counting the number of factors on each side. The particular weight of such opposing circumstances is not determined by their relative number, but rather by their relative convincing force on the ultimate question of punishment." Consistent with this instruction, both counsel's arguments properly and persuasively emphasized the jury's normative "choice" of penalty; contrary to defendant's reading of the record, the prosecutor never even suggested the jury should simply "count" the opposing factors. On this record it is not possible the jury was misled about its sentencing discretion. (See *Allen, supra,* 42 Cal.3d at pp. 1276-1280.)

### 14. *Davenport error*

Contrary to *People v. Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861] and its progeny, the prosecutor argued that the absence of mitigation under section 190.3, factors (e) (victim participation or consent in the homicide), (f) (reasonable belief in moral justification or extenuation), (g) (extreme duress or substantial domination), and (j) (accomplice or minor participation), rendered each of those factors aggravating. As we have held in numerous cases, such argument, although improper, may not be asserted as prosecutorial misconduct because a timely admonition would have cured any harm. (See, e.g., *Brown, supra,* 46 Cal.3d at p. 456.) Also as in each of our prior cases, however, we conclude there is no reasonable possibility the prosecutor's argument prejudiced the sentencing decision.

Our resolution of this issue in *Brown, supra,* 46 Cal.3d 423—in which the prosecutor improperly asserted that at least *six* of the factors for which there was no evidence of mitigation constituted factors in aggravation (*id.,* at p. 455, fn. 10)—serves to dispose of the issue here as well: "First, as we explain[ed] above, on this record a reasonable jury would not have been misled about the nature of its weighing process. Second, we note the jury was instructed to consider the listed factors only 'if relevant'; thus, we believe a reasonable jury would have understood that it was allowed to give those factors whatever little weight they deserved. Given this, and in view of

the overwhelming nature of the properly introduced aggravating evidence, we conclude it is not reasonably possible that the prosecutor's unobjected-to mischaracterization of the aggravating circumstances would have influenced a reasonable jury's sentencing decision." (*Id.*, at p. 456.)

### 15. *Excessive multiple-murder special circumstances*

Defendant correctly observes the jury found true two multiple-murder special circumstances, when under our cases (e.g., *Allen, supra,* 42 Cal.3d at p. 1273) only one should have been charged and found true. As in *Allen,* it follows that one such special circumstance must be set aside; but also as in *Allen,* and every other case in which this issue has arisen, we find the error harmless. The jury had before it one valid multiple-murder special circumstance, and two kidnapping-murder special circumstances. At argument the prosecutor did not emphasize the number of special circumstances found true. Accordingly, the jury did not consider under factor (a) (§ 190.3, factor (a)) any evidence that was not otherwise admissible and relevant (*Allen, supra,* 43 Cal.3d at p. 1281). In view of the proper aggravating factors, the prosecutor's argument, and the other properly admitted aggravating evidence, there is no reasonable possibility that the presence of one extra multiple-murder special circumstance affected the verdict.

### 16. *Refusal to instruct on disparity in sentence between defendant and Charlene*

Defendant insists the court erred by refusing to instruct that the jury could consider any "disproportionate disparity" between his and Charlene's sentences, in fixing the penalty. The court's refusal was not error because, as we have held in *Dyer, supra,* 45 Cal.3d at pages 69-71, such evidence is *irrelevant* to the capital jury's sentencing determination. (See *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1249 [255 Cal.Rptr. 569, 767 P.2d 1047].)

### 17. *Instructions on the Governor's commutation power*

Pursuant to our decision in *People* v. *Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908], the court refused to give the "Briggs" commutation instruction which, we have noted, violates our state Constitution because it fails to advise the jury that a penalty of death, as well as life without possibility of parole, may be commuted. (*People* v. *Ramos* (1984) 37 Cal.3d 136, 155-158 [207 Cal.Rptr. 800, 689 P.2d 430] [*Ramos II*].)
Defendant asked the court to give an alternative instruction that (i) accurately reflected the Governor's commutation power, but which (ii) also

instructed the jury not to consider the possibility of commutation in its sentencing decision.

As we noted in *Coleman, supra*, 46 Cal.3d 749, 782, footnote 27, *Ramos II, supra*, 37 Cal.3d at page 159, footnote 12, suggests defendant's proffered instruction—at least the last part of it—should have been given. Of course the court did not have the benefit of *Ramos II* at the time of trial, but even assuming error we find no prejudice. In the absence of evidence that the jury actually considered the Governor's commutation power, there is no reasonable possibility the court's failure to give the cautionary instruction prejudiced defendant.

18. *Failure to instruct jury to ignore CALJIC No. 1.00 at the penalty phase*

■ Defendant asserts the court erred in failing to inform the jury that the "no sympathy" instruction (CALJIC No. 1.00), which was delivered at the guilt phase, is inapplicable at the penalty phase. As noted above however, the court did inform the jury that *"unlike during the guilt phase of this trial, you may consider humanity and mercy. . . ."* (Italics added.) In any event, as we have previously held, the court does not err by failing to instruct the penalty phase jury to ignore the previously given guilt phase instruction. (See *Brown, supra*, 46 Cal.3d 432, 460.)

19. *Error in giving defendant's requested instruction on deterrence*

■ At defendant's request the court modified former CALJIC No. 8.84.1 by adding factor (*l*), informing the jury it could consider in sentencing "[w]hether or not execution as contrasted with life without possibility of parole will deter future acts of murder." He now asserts the court erred to his prejudice in giving his requested instruction.

The claim is precluded by the invited error doctrine. (*Wickersham, supra*, 32 Cal.3d 307, 330.) Defendant, through his counsel, made a tactical decision to present expert evidence on deterrence, and to request the instruction. In any event, contrary to defendant's assertion, the instruction was not erroneous under *Murtishaw, supra*, 29 Cal.3d 733, 767-768, which precludes the People from presenting expert evidence of a defendant's "future dangerousness." As the People observe, *Murtishaw* is inapplicable. Here the *defense* introduced evidence that the death penalty was not a deterrent when compared to life in prison without the possibility of parole, and the instruction merely allowed the jury to consider that evidence.

20. *Argument to the jury*

 Defendant asserts the court erred in failing to allow him, after the close of evidence and after arguments by the prosecutor and defense counsel, to address the penalty jury. As we held in *Robbins, supra,* 45 Cal.3d at pages 888-890, a capital defendant has no such right of allocution, and hence the court did not err. We also reject defendant's related argument that he should have been allowed to address the jury because he was entitled to have two attorneys argue his case. (See *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 429 [180 Cal.Rptr. 489, 640 P.2d 108].) Defendant was not granted the right to represent himself at the penalty trial. Because he had only one attorney—Mr. Fathy—*Keenan, supra,* is inapposite.

21. *Proportionality*

a. *Comparative sentence review.* We have previously rejected in numerous cases defendant's suggestion that we should or must undertake comparative sentence review. (See, e.g., *Guzman, supra,* 45 Cal.3d at p. 966.)

b. *Dillon/Lynch analysis.* Defendant also claims that in light of Charlene's sentence of 16 years, 8 months, his sentence is disproportionate under the rule of *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697] and *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921]. The record shows, however, that defendant was the primary actor and driving force in the murders. There is no merit in his suggestion that the prescribed punishment for the offenses of kidnapping/murder, etc., is more severe than that prescribed for less serious crimes, or that the penalty is disproportionate to that prescribed for the same offense in other jurisdictions. Nor, in view of the facts of this case, can defendant reasonably assert the punishment is disproportionate to his individual culpability. (Accord *Allen, supra,* 42 Cal.3d at p. 1286.)

22. *Other constitutional challenges to the death penalty*

 Contrary to defendant's assertion, there is no requirement that aggravating factors be found to outweigh those in mitigation "beyond a reasonable doubt." (E.g., *Allen, supra,* 42 Cal.3d at p. 1285). Nor is the death penalty "cruel and unusual punishment" under the federal or state Constitutions. (See, e.g., *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 184-186 [158 Cal.Rptr. 281, 599 P.2d 587].)

### 23. *Denial of defendant's Marsden motion*

On the second day of the penalty trial defendant told the court he disagreed with Mr. Fathy's strategy—he was particularly upset that Fathy did not vigorously contest the Aguilar and Mochel murders—and he discussed waiving his presence for the remainder of the trial. He moved to dismiss counsel, but after extended discussions with the court, the next morning defendant announced, "I'm not going to desert my lawyer." A week later, at the close of the penalty trial, he again moved to dismiss Fathy, "and ask the Court to appoint me a new attorney . . . ." After listening to his reasons, the court denied the motion, with the closing comment, "the motion *for self-representation* is denied."

 Defendant, seizing on the italicized comment, asserts the court believed defendant was really making a *Faretta* motion, and thus erred in rejecting his *Marsden* motion and in denying defendant's asserted *Faretta* motion without conducting a hearing. The record refutes the claim. The court clearly understood—as defendant plainly stated three times—that defendant wanted appointment of a "new attorney," and did not seek self-representation. The court listened to defendant's complaints, responded in detail to his concerns about Fathy's strategy, and explained that in its view those disagreements did not warrant a change of counsel "practically at the conclusion of [the] trial."

No abuse of discretion appears. The court properly determined that under the circumstances the disagreement in tactics did not signal a breakdown in the attorney-client relationship sufficient to jeopardize defendant's right to effective assistance of counsel. (See *People* v. *Williams* (1970) 2 Cal.3d 894, 904-906 [88 Cal.Rptr. 208, 471 P.2d 1008].) The court's apparent slip-of-tongue at the conclusion of its ruling provides no basis for reversal.

### 24. *Failure to examine and admonish the jury*

During the testimony about the killing of Aguilar the court was informed by a juror that alternate Juror Thomas—who was pregnant—was not feeling well, and was upset about the effect of the testimony on her pregnancy. Thomas then approached the court and stated she felt she could not continue, having become very upset about the testimony of the murder of Aguilar, who, as noted above, was also pregnant.

The court suggested Thomas be excused, and defense counsel stated he had no objection to doing so. The court then explained to the jury that Thomas was excused "for medical reasons." Defendant now sug-

gests the court should have examined sua sponte the remaining jurors to determine if they had been improperly influenced by Thomas, and also should have admonished the jury against considering Thomas's experience in determining the proper penalty. Even assuming such a sua sponte duty, in the absence of any evidence of misconduct by Thomas or any other member of the jury we conclude there is no reasonable possibility the jury's deliberations were improperly affected.

### 25. *Failure to remove a juror*

During the penalty phase Juror Youngman attempted to give some religious material to defendant. Thereafter she was questioned in chambers in the presence of both counsel. She explained she had become concerned with defendant's soul, and believed it was her duty as a Christian to "give him the word of God so that, you know, he has it. I mean it can be a comfort to him." She conceded that she had discussed this point with her husband, and on further questioning stated her religious feelings would not affect her ability to follow the instructions and fairly decide the sentence.

The prosecutor asked to excuse Youngman, and defendant's counsel strenuously objected. Defendant now asserts the court erred by ruling in his favor and allowing Youngman to remain. The issue is waived by counsel's action, which was itself plainly based on his tactical assessment, reasonable under the circumstances, that Youngman would be sympathetic to his case. We perceive neither error nor ineffective counsel.

### 26. *Ineffective trial counsel*

Defendant has the burden of proving counsel's unreasonable performance and resulting prejudice. (See *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *Strickland, supra*, 466 U.S. 668, 693-696 [80 L.Ed.2d at pp. 697-699] [reasonable probability standard].)

a. *Failure to agree to represent defendant at the guilt phase*. As noted above, defendant refused to be represented by counsel at the guilt trial, discharged both counsel, Manning and Fathy, and refused the assistance of advisory counsel. Later he changed his mind after having difficulty cross-examining Charlene, and on defendant's behalf the court asked Fathy to return to the trial. Fathy agreed to do so on the condition the court grant a mistrial, which the court declined to do.

Defendant was not denied effective assistance of counsel by Fathy at the guilt phase, because Fathy, after being discharged at defendant's

request, was not defendant's counsel at that time. Having represented himself, defendant cannot assert he received ineffective guilt phase representation. (*Faretta, supra*, 422 U.S. 806, 835, fn. 46 [45 L.Ed.2d at p. 581].) In any event, we reject defendant's suggestion that Fathy breached a duty to him by failing to return to the trial without conditions after defendant changed his mind. Under the circumstances, we perceive nothing unreasonable in Fathy's conduct.

b. *Failure to properly rebut the Aguilar/Mochel murders.* Defendant asserts Fathy performed unreasonably by failing to challenge the prosecution's assertion that he murdered Aguilar and Mochel, and attempted to escape. It is true that counsel might have treated the aggravating evidence as a guilt trial, and attempted to meet it with rebuttal evidence. But counsel was faced with a jury that had already convicted defendant of multiple murder, had heard extensive testimony on the Vaught/Scheffler murders, and had undoubtedly already formed the view that defendant is a cold-blooded serial killer. It would have served little purpose to contest these additional crimes.

Instead, counsel reasonably focused on Charlene's role in the killings, defendant's difficult childhood, possible brain trauma or genetic defects affecting defendant's ability to control his conduct, and the possible effects of drugs and alcohol on defendant's brain. Finally, counsel asserted society would be adequately protected if defendant were sentenced to life in prison without possibility of parole. Under the circumstances, counsel could have reasonably concluded that to contest the other crimes more forcefully would only damage his credibility and detract from his other defenses. We find no unreasonable performance.

c. *Failure to make evidentiary objections.* Defendant faults counsel for failing to object to photographs of victims Aguilar and Mochel taken while they were alive. As we explained above (pt. II.13), the photographs were relevant and proper evidence; no defective performance appears.

d. *Failure to seek removal of juror.* Defendant faults counsel for failing to seek removal of Juror Youngman, after she approached defendant in an attempt to give him religious materials. As we explained above (pt. IV.25.), counsel had an obviously proper tactical reason to decline to seek the juror's removal. Again, no defective performance appears.

e. *Stipulation to juvenile adjudications.* As noted above, by stipulation the jury was instructed on defendant's prior criminal record—including an adjudication for lewd conduct when he was 13, and an adjudi-

cation for armed robbery when he was 16. Also as noted above, the latter adjudication was properly admitted at the penalty trial, and counsel could reasonably have determined that it was better to stipulate rather than allow the prosecutor to introduce further testimony about defendant's various violent crimes. We also held above that under our analysis in *Lucky, supra,* 45 Cal.3d at page 295, the former adjudication may not have been admissible, absent a showing that it involved violence. Such a showing, however, would likely have not been difficult, and thus we are reluctant to find defective performance in this regard. In any event, however, any assumed misjudgment by penalty phase counsel was plainly harmless in light of the other properly introduced aggravating evidence in this case. (*Strickland, supra,* 466 U.S. 668, 693-696 [80 L.Ed.2d at pp. 697-699].)

## V. *Conclusion*

The judgment of guilt and the finding of three special circumstances are affirmed. One multiple-murder special circumstance is set aside. The judgment of death is affirmed.

Broussard, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.

Panelli, J., concurred in the judgment.

**MOSK, J.,** Concurring.—I concur in the judgment. After review, I have found no error warranting reversal.

I write separately, however, to set forth my reasons for rejecting defendant's claim that in its instructions the trial court erred by failing to label the penalty factors as "aggravating" or "mitigating."

Under the 1978 death penalty law (Pen. Code, § 190 et seq.), the determination of punishment turns on the personal moral culpability of the capital defendant. (See *id.,* § 190.3; see also *People* v. *Malone* (1988) 47 Cal.3d 1, 54-55 [252 Cal.Rptr. 525, 762 P.2d 1249] [impliedly recognizing the point]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861] (plur. opn.) [same].) Culpability is assessed in accordance with specified factors of "aggravation" and "mitigation" (Pen. Code, § 190.3) as construed in the case law: (a) the circumstances of the crime; (b) prior violent criminal activity; (c) prior felony convictions; (d) extreme mental or emotional disturbance; (e) victim participation or consent; (f) reasonable belief in moral justification or extenuation; (g) extreme duress or substantial domination; (h) impairment through mental disease or defect or through intoxication; (i) age; (j) status as an accomplice and minor participant; and (k) any other extenuating fact. (*Ibid.*)

As used in the law, "aggravation" means that which increases the personal moral culpability of the defendant above the level of blameworthiness

that inheres in the capital offense. (See *People* v. *Malone, supra*, 47 Cal.3d at pp. 54-55; *People* v. *Davenport, supra*, 41 Cal.3d at p. 289 (plur. opn.).) By contrast, "mitigation" means that which reduces the defendant's culpability below that level. (See *People* v. *Malone, supra*, at pp. 54-55; *People* v. *Davenport, supra*, at p. 289 (plur. opn.).)

It follows that, strictly speaking, none of the *penalty factors* is "aggravating" or "mitigating." Rather, it is the *circumstances* they define that are properly characterized as such. The point is established by the very words of the law: "aggravating" and "mitigating" are *always* used to modify "circumstances," and never to modify "factors" (Pen. Code, § 190.3).

Therefore, I am of the opinion that the trial court did not err in its instructions by failing to label the penalty factors as "aggravating" or "mitigating." It is, of course, virtually axiomatic that a court must correctly instruct on the law, and that it acts properly when it does so. Here, the court's instructions were in conformity with the law. "Labeling" would not have been.

I recognize that the trial court did not define "aggravation" and "mitigation." To be sure, such a definition may provide a " 'helpful framework' for the jury's consideration" of the penalty to be imposed (*People* v. *Malone, supra*, 47 Cal.3d at pp. 54-55)—and should therefore be given in the future to foster rational decisionmaking. In the general case, however, its omission is not error. (*Id.* at p. 55.) " 'Aggravation' and 'mitigation' are commonly understood terms. A trial court is not required to instruct on the meaning of terms that are commonly understood." (*Ibid.*) In my view, the failure of the court to define the words in question was not erroneous here.

I also recognize that the trial court did not identify which circumstances were "aggravating" and which "mitigating." Like the definitions referred to above, identification may aid the jury and should generally be given in the future. But also like those definitions, its omission is usually not error. (See *People* v. *Malone, supra*, 47 Cal.3d at p. 55.) A jury should be able to identify the specified circumstances as "aggravating" or "mitigating" by itself. (*Ibid.*) This is because their nature is "self-evident." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 316 [168 Cal.Rptr. 603, 618 P.2d 149] (plur. opn.) [speaking of the similar circumstances included in the penalty factors specified in former Pen. Code, § 190.3 under the 1977 death penalty law, Stats. 1977, ch. 316, § 11, pp. 1258-1260].)[1] To my mind, the failure of the court to identify the circumstances was not erroneous in this case.

---

[1] Thus, it is manifest that the circumstances of the crime itself (Pen. Code, § 190.3, factor (a)) can be either aggravating or mitigating. Their character depends on the greater or lesser blameworthiness they reveal.

The same is true of prior violent criminal activity. (Pen. Code, § 190.3, factor (b).) The presence of such activity suggests that the capital offense is the product more of the defend-

For the reasons stated above, I conclude that the trial court did not err by failing to label the penalty factors as "aggravating" or "mitigating."

Accordingly, having found no error warranting reversal on this point or any other, I concur in the judgment.

Appellant's petition for a rehearing was denied February 27, 1991.

---

ant's basic character than of the accidents of his situation, whereas its absence suggests the opposite. (Cf. Model Pen. Code & Commentaries, com. 6 to § 210.6, pp. 136-138 [speaking of the "aggravating circumstance" of prior violent felony conviction and the "mitigating circumstance" of lack of prior criminal activity].)

Similarly, prior felony convictions (Pen. Code, § 190.3, factor (c)) can be either aggravating or mitigating. Like the presence or absence of prior violent criminal activity, the existence or nonexistence of previous convictions reflects on the relative contributions of character and situation. Further, the existence of such convictions reveals that the defendant had been taught, through the application of formal sanction, that criminal conduct was unacceptable—but had failed or refused to learn his lesson.

The age of the defendant (Pen. Code, § 190.3, factor (i)) can also be either aggravating or mitigating. Age functions "as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].)

The existence of any of the following circumstances, however, is mitigating and mitigating only: extreme mental or emotional disturbance (Pen. Code, § 190.3, factor (d)); victim participation or consent (*id.*, factor (e)); reasonable belief in moral justification or extenuation (*id.*, factor (f)); extreme duress or substantial domination (*id.*, factor (g)); impairment through mental disease or defect or through intoxication (*id.*, factor (h)); status as an accomplice and minor participant (*id.*, factor (j)); and any other extenuating fact (*id.*, factor (k)). (See, e.g., *People* v. *Marshall* (1990) 50 Cal.3d 907, 944 [269 Cal.Rptr. 269, 790 P.2d 676] [dealing with factors (d), (f), (g), and (j)]; *People* v. *Davenport, supra,* 41 Cal.3d at p. 289 (plur. opn.) [dealing expressly with factors (e) and (f) and impliedly with factors (d), (g), (h), and (j)]; *People* v. *Boyd* (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782] [dealing with factor (k)].)

By contrast, the nonexistence of any of the foregoing circumstances is not and cannot be aggravating. The absence of mitigation does not amount to the presence of aggravation. (See *People* v. *Marshall, supra,* 50 Cal.3d at p. 944; *People* v. *Davenport, supra,* 41 Cal.3d at p. 289 (plur. opn.).)